PENINSULA MARKETING ASSOCIA-TION, Concerned Area M Fishermen, Aleutians East Borough, Shumagin Corporation, Qagan Tayagungin Tribal Council, Agdaagux Tribal Council, Unga Tribal Council, Unga Corporation, Nelson Lagoon Village Council, and False Pass Tribal Council, Petitioners,

v.

Carl ROSIER, in his official capacity as Commissioner of the Alaska Department of Fish and Game, and the Alaska Department of Fish and Game, Respondents,

and

Native Village of Elim, Nome Eskimo Community, Kawerak, Inc., and Arctic Regional Fish and Game Council, Respondents and Cross–Petitioners.

Nos. S–6413, S–6423.

Supreme Court of Alaska.

Feb. 24, 1995.

Michael A.D. Stanley, Juneau, Alvin J. Ziontz and Marc D. Slonim, Ziontz, Chestnut, Varnell, Berley and Slonim, Seattle, for petitioners.

T. Henry Wilson, Asst. Atty. Gen., Anchorage, and Bruce M. Botelho, Atty. Gen., Juneau, for respondents.

Eric Smith, Anchorage, for respondents and cross-petitioners.

Before MOORE, C.J., RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

COMPTON, Justice.

The Commissioner of the Department of Fish and Game (Commissioner) presented a fisheries management proposal to the Board of Fisheries (Board). The proposal was rejected. The Commissioner then indicated that he intended to implement the proposal by utilizing his emergency powers, notwithstanding the Board's decision. The superior court enjoined the Commissioner from using his emergency powers if based on information already presented to the Board, but declined to enjoin him from using those powers if based on newly developed information or events occurring after the Board's rejection of his proposal. The superior court also purported to authorize the governor to take emergency action. We granted a petition and cross-petition for review. *See* Alaska R.App.P. 402(a). We affirm the superior court's order on the single issue remaining for determination.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. FACTUAL HISTORY

The Board of Fisheries placed a cap on the number of chum salmon incidentally caught in the False Pass commercial red salmon fishery.[1] Residents of the Arctic–Yukon–Kuskokwim (AYK) region rely on chum runs for winter food; the taking of chum is an important aspect of the traditional subsistence lifestyle in the area. The effect of the incidental chum harvest in the False Pass fishery on the AYK chum returns has been a matter of controversy and debate for years. *See Peninsula Marketing Ass'n v. State*, 817 P.2d 917, 919–20 (Alaska 1991).

In 1982 and 1983 the incidental chum harvest in the False Pass fishery was unusually high. In the mid–1980s, AYK chum returns declined steadily. In response, the Board promulgated a regulation closing the False Pass fishery when the incidental harvest of chum reached a certain level. In 1986 the chum level was capped at 400,000 fish. The cap was repealed for the 1987 season, but reinstated at 500,000 for 1988 and 1989, and 600,000 for 1990 and 1991. In 1990, the Board also instituted other restrictions to reduce the incidental chum harvest. The cap was exceeded in 1991, with a chum harvest of 771,000. For the 1992 season, the Board originally passed a variable chum cap, but later amended the regulation to provide an overall cap of 700,000 chum, with additional restrictions to reduce the chum harvest once 400,000 chum had been harvested. In adopting this approach to the chum problem,

> [t]he board found however, that the data presented were insufficient to establish a direct and biologically significant cause and effect relationship between chum harvests in the June fishery and depressed returns in [the AYK area], in that reductions in the June fishery would not be likely to produce detectable increased [sic] in chums in the depressed [AYK area].

The 700,000/400,000 cap was utilized during the 1992 and 1993 seasons. The decline in the AYK chum returns continued during the early 1990s.

In 1993 there was a drastic and widespread decline in the number of chum returning to the AYK area streams. At a special non-regulatory meeting in December 1993, the Board directed the Commissioner to prepare additional measures for consideration at the Board's regular March 1994 meeting. At the March meeting, the Commissioner recommended that the chum cap be lowered to 300,000. The Board heard extensive public testimony and considered staff reports on the issue. It failed to adopt the Commissioner's proposal.[2]

---

1. The parties refer to this fishery variously as the False Pass fishery, the June fishery, and the Area M fishery. To avoid confusion, we will refer to this as the False Pass fishery.

2. The Board consists of seven members. To enact or amend a regulation, four members of the Board must vote for the measure. AS 16.05.320. Prior to voting on this proposal, the Board Chair had disqualified two Board members.

At this meeting the Board implemented other conservation measures to preserve AYK chum stocks. In the False Pass area, the Board eliminated the fixed opening date and fishing periods, granting the Commissioner the authority to use his emergency powers in this region. "The department may open the fishing season ... by emergency order to allow commercial fishing when the ratio of sockeye salmon to chum salmon indicates that chum salmon harvest will be minimized. The department shall establish fishing periods by emergency order." 5 AAC 09.365(d).

Governor Walter J. Hickel then directed the Commissioner to use his emergency powers to increase the chum escapement into various river systems, notwithstanding the Board's failure to adopt the Commissioner's proposal to lower the chum cap.

## B. PROCEDURAL HISTORY

On April 28, 1994, the Peninsula Marketing Association and others (PMA) filed suit in superior court in Juneau to enjoin the Commissioner from implementing the Governor's directive. The Native Village of Elim and others (Elim) resurrected a suit they had filed two years earlier in Nome, in which they sought to enjoin the 1992 700,000/400,000 chum cap.

Elim filed a motion to consolidate the Nome suit with the suit filed by PMA; the motion was granted over PMA's objection. Elim then filed a motion to enjoin (compel) the Commissioner to implement the 300,000 chum cap he had recommended to the Board. It requested expedited consideration of its motion. PMA filed a motion for declaratory relief on its claims, also requesting expedited consideration. Hearings on the motions were held in Anchorage.

The court ruled from the bench on June 8, essentially granting PMA the relief it had requested:

> In this specific circumstance where the Board has disagreed with the Commissioner's conclusion, it is important to clarify his emergency order authority.... Given the full review of the conservation issues presented to the Board in both December and March meetings, the Commissioner is prohibited from taking any action on the [False Pass] fishery based upon the information already presented. That does not prevent the Commissioner from taking emergency order authority on the [False Pass] fishery based on some additional information not available previously, and using the information he already has. However, if all the information available is only that which was available at the Board meeting the Commissioner is prohibited from taking emergency order action.

In addition, the court *sua sponte* directed that the question be submitted to the Governor for determination. The court analogized the dispute between the Board and Commissioner to that described in AS 16.05.270.[3] The Governor responded by lowering the chum cap to 350,000, although the Governor expressed doubts concerning his power to do so.

PMA petitioned this court for review of the superior court's order directing submission of the issue to the Governor for determination. *See* Alaska R.App.P. 402(a). It also requested "an appropriate writ" prohibiting the Governor from implementing his decision to lower the chum cap to 350,000. Elim filed a cross-petition for review, requesting that this court vacate the injunction imposed on the Commissioner by the superior court. Both parties filed emergency motions to obtain interim relief. A single justice entered an order granting PMA's motion to stay en-

The Commissioner's proposal failed with three votes for and two against. After reconsideration, one Board member changed his vote from for to against; again the proposal failed, this time with two votes for and three against.

**3.** Alaska Statute 16.05.270 provides:
   For the purpose of administering AS 16.05.251 and 16.05.255, each board may delegate authority to the commissioner to act in its behalf.

If there is a conflict between the board and the commissioner on proposed regulations, public hearings shall be held concerning the issues in question. If, after the public hearings, the board and the commissioner continue to disagree, the issue shall be certified in writing by the board and the commissioner to the governor who shall make a decision. The decision of the governor is final.

forcement of the Governor's recommendation to lower the chum cap to 350,000, and denying Elim's motion to stay the injunction against the Commissioner. *See* Alaska R.App.P. 503(f). Elim sought full court reconsideration of the single justice order. *See* Alaska R.App.P. 503(g). Full court reconsideration was denied. The petition and cross-petition were granted. *See* Alaska R.App.P. 402(b).

## II. *DISCUSSION*

We granted review on only two issues: (1) "did the superior court err in submitting the determination of the chum cap to Governor Walter J. Hickel under AS 16.05.270?" and (2) "did the superior court err in precluding Commissioner Carl J. Rosier from employing his emergency powers under AS 16.05.060(a) to a question which has been considered and resolved by the Board of Fisheries by regulation, in the absence of significant new facts?"

Consideration of the first issue has been waived by the parties. At oral argument the parties agreed that AS 16.05.270 only applies where the Board has delegated its rule-making authority to the Commissioner, and later disagrees with the use the Commissioner makes of this delegated authority. This was not the situation presented to the superior court. Additionally, the parties essentially did not brief the issue. "[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal." *Adamson v. University of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991) (citations omitted).[4] Therefore, the

sole issue before the court is the scope of the Commissioner's emergency powers.

## A. MOOTNESS

█ The issue presented is technically moot. However, we accepted this petition and cross-petition because they fall under the public interest exception to the mootness doctrine. In applying the public interest exception we consider

> (1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may repeatedly circumvent review of the issues and, (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine.

*Hayes v. Charney*, 693 P.2d 831, 834 (Alaska 1985). These factors are only guidelines; application of the exception is discretionary with the appellate court. *Peninsula Marketing Ass'n v. State*, 817 P.2d 917, 920 (Alaska 1991). The issue of the Commissioner's emergency power over matters previously considered by the Board will likely resurface and avoid review. By the time the court reviews the Commissioner's use of emergency power, the emergency is likely to be over. Conservation and utilization of fish and game resources are important to the public interest in Alaska. For these reasons we decided to hear the merits of this case.[5]

## B. THE ALASKA CONSTITUTION AND THE STATUTORY FRAMEWORK

The Alaska Constitution delegates to the Alaska State Legislature (Legislature) the

---

4. Elim declined to address the issue, except to note that the superior court utilized AS 16.05.270 only by analogy and did not purport to be operating under its letter. The State concedes that the statute applies only when the Commissioner operates "under a specific delegation of rule-making authority from the Board." There was no such delegation in the present case. PMA throughout its brief and oral argument opposed the superior court's use of the statute to submit the issue to the Governor.

5. In *Peninsula Marketing Ass'n v. State*, 817 P.2d 917 (Alaska 1991), we discussed the application of the mootness doctrine to disputes about the False Pass fishery. In that case, PMA challenged (1) the reasonableness and constitutionality of

the 1988 chum cap of 500,000 fish, and (2) the Board's statutory power to set the cap. In the second argument, PMA asserted that the statutory authority to "establish criteria for the allocation of fishery resources among personal use, sport, and commercial fishing" did not give the Board the power to allocate fishery resources between two or more commercial uses. *Peninsula Marketing*, 817 P.2d at 920; *see* AS 16.05.251(e). PMA distinguished between intergroup and intra-group allocations. We held that this second argument, although technically moot, met the requirements of the public interest exception. We held that the first argument, the challenge to the level of the cap, was moot and did not meet these requirements. *Id.* at 920.

allocation of power between boards and commissioners. "The head of each principal department shall be a single executive *unless otherwise provided by law.*" Alaska Const. art. III, § 25 (emphasis added). "When a board or commission is at the head of a principal department ... its members shall be appointed by the governor, subject to confirmation by a majority of the members of the legislature...." Alaska Const. art. III, § 26.

Although Elim concedes that the Legislature has complete authority to allocate power within the departments, it nonetheless argues that there is a preference for strong department heads. It contends that those who drafted the Alaska Constitution "left the matter to the legislature to resolve, but within the context of an overall preference to establish strong departmental heads to administer programs." This preference is not supported by proceedings of the Alaska Constitutional Convention.[6] Although the proposal at the Constitutional Convention placing all regulatory and administrative power over fish and game in a board was defeated, the result was not to place the department head in a position of authority over this board.

In reviewing debate at a constitutional convention, as with any other law-making body, it is imperative to keep issues separate. Although Elim provides a variety of quotations from delegates to the Alaska Constitutional Convention to demonstrate that the framers preferred strong department heads to boards, these quotations are used out of context and come from debates regarding different issues. Also, not one is an excerpt of a discussion regarding how much authority commissioners would have in relation to boards or commissions.

Elim quoted Delegate McCutcheon as saying,

We are a group of citizenry here who are, by and large, tired of rule by board. It

may have been necessary in a protection in past years in order to eliminate too much influence from an absentee governor, or one appointed by absentees, in dominating our Territorial affairs. We have created boards for the purpose of getting away from Washington, D.C., and controlling our own affairs, but when we can elect our own governor, he sets up his upper cabinet and operates the government in conjunction with the legislative branch.... [I] am absolutely opposed, predicated on experience and analysis of this thing, that we strike this particular thing.

This statement was made in opposition to an amendment that would have deleted the requirement in article III, section 26 that the appointment of an executive officer of a principal department be subject to the approval of the governor. 3 Proceedings of the Alaska Constitutional Convention (PACC) 2249 (Jan. 16, 1956). McCutcheon made the quoted declaration because he wanted to ensure that the responsibility for the departments being established was affixed to the governor.

Delegate McNealy's comments, also quoted by Elim to demonstrate the intent of the framers, relate to a wholly different issue. Elim quotes Delegate McNealy:

Delegate McNealy accordingly forcefully argued against mandating the commission form of government on the ground that it should be left to the legislature to decide "if they want to set up one commission, well and good, or if they feel it is necessary to set up two commissions under it, or under a principal department head, or however they care to do this...."

However, Delegate McNealy's comments do not support Elim's position that the framers intended the Commissioner to be more powerful than the Board. Delegate McNealy's comments were made in opposition to a proposal, adopted in article III, section 22, authorizing the Legislature to establish regula-

---

**6.** It is a time honored practice to review debate at a constitutional convention to interpret constitutional provisions. Similarly, legislative history is reviewed in interpreting statutes. However, Elim takes these practices a step beyond their ordinary application. It has reviewed debate at the Alaska Constitutional Convention to interpret

the Legislature's intent when it enacted statutes establishing the structure of the Department of Fish and Game. Elim provides no authority to support this analytical framework which transfers the intent of one body to the product of another body.

tory and quasi-judicial agencies. 4 PACC 2508 (Jan. 18, 1956). He was concerned about combining rulemaking and enforcement powers in the same body. All that Delegate McNealy's comments reveal is that the framers intended to leave the structure of the department to the Legislature.

Thus, Elim's argument that while the constitutional convention delegates "did not expressly reject the use of a board, they remained concerned that any such board should be placed within a principal department with a head who would be accountable directly to the governor" is unpersuasive. The discretion granted to the Legislature by article III, section 25 of the Alaska Constitution, belies the argument that the Alaska Constitution evidences an overall preference for strong department heads and, implicitly, for weak boards and commissions. *See* 3 PACC 2203–11 (Jan. 14, 1956); 3 PACC 2249–52 (Jan. 16, 1956); 4 PACC 2502–22 (Jan. 18, 1956). The authors of the Alaska Constitution explicitly chose to leave the structure of the department to the Legislature. Thus, the answer to the question before us lies not in an analysis of constitutional debate, but rather in the statutory framework.

### C. STATUTORY FRAMEWORK—THE COMMISSIONER DOES NOT HAVE VETO POWER OVER BOARD DECISIONS

■ The statutory structure of the Department reflects a legislative objective: (1) to divide rule-making and administrative authority, (2) to insure that fish and game decisions are made by knowledgeable persons, and (3) to limit the direct influence of the Governor on daily fish and game management issues.

Responsibility for fisheries management is divided between the Commissioner and the Board. The Commissioner is directed to "control the department" and "manage, protect, maintain, improve, and extend the fish ... resources of the state" and is vested with all "necessary power to accomplish the foregoing." AS 16.05.020. This is a broad grant of authority. However, the statutory list of the specific powers and duties of the Commissioner relates principally to administration and budgeting. AS 16.05.050. The Board specifically is directed to adopt regulations "establishing open and closed seasons and areas for the taking of fish" and "setting ... harvest levels." AS 16.05.251(2) & (3).[7]

By statute, the Commissioner and the members of the Board are expected to be knowledgeable and experienced in fisheries protection and management. AS 16.05.010; AS 16.05.221(a). The Commissioner is appointed to a five-year term. AS 16.05.010. The members of the Board serve staggered three-year terms. AS 16.05.221(c). Appointed members must be approved by the Legislature in joint session and can only be removed for specified misconduct. AS 16.05.221; AS 16.05.280. These protective measures were instituted to ensure that fisheries decisions are made by knowledgeable persons based on their independent judgment, rather than immediate political pressure.

Elim concludes from the constitution and statutory structure of the Department that the Commissioner "has *independent* authority to regulate fishing on the basis of emergency orders, either to implement the management plan or to avoid a biological emergency that would arise should the management plan ... be implemented."[8] The State

---

7. "For purposes of the conservation and development of the fishery resources of the state, there is created the Board of Fisheries...." AS 16.05.221(a). The Board's powers are regulatory. "The boards have regulation-making powers as set out in this chapter, but do not have administrative, budgeting, or fiscal powers." AS 16.05.241. It may regulate, in accordance with AS 44.62 (Administrative Procedure Act) almost every aspect of fishing: fish reserves, open and closed seasons, quotas or bag limits, means and methods by which fish can be taken, classifying types of fishing, etc. AS 16.05.251(a).

8. The Commissioner's emergency powers under AS 16.05.060 do not explicitly grant the Commissioner the authority to veto actions taken by the Board. The single justice order entered on July 15, 1994, upheld the superior court's stay of the Commissioner's use of his emergency powers based on an analysis of the statutory framework of the Department. The single justice concluded:

The Board has the rule-making authority for fisheries policy in the Department. The Commissioner is empowered to effectuate these policies. The emergency powers granted to

asserts that the Commissioner has the power to issue two types of emergency orders: (1) field orders, which implement but do not contradict Board regulations; and (2) true emergency orders, which can be used to address biological crises and may contravene Board regulations. Neither Elim nor the State suggest that there is a limitation on the Commissioner's power to declare a biological emergency and overrule the Board. Both rely on the unconditional language through which AS 16.05.060(a) conveys emergency power to the Commissioner. "This chapter does not limit the power of the commissioner . . . when circumstances require, to summarily open or close seasons or areas or to change weekly closed periods on fish or game by means of emergency orders." AS 16.05.060(a). They point out that the Commissioner's other emergency powers are explicitly limited in AS 16.05.060(b). "The commissioner . . . may, *under criteria adopted by the Board of Fisheries,* summarily increase or decrease sport fish bag limits or modify methods of harvest for sport fish by means of emergency orders." AS 16.05.060(b) (emphasis added).

Although both PMA and Elim emphasize the difference in the language used in AS 16.05.060(a) and AS 16.05.060(b), their conclusions about the meaning of this dissimilarity are disparate. Under the interpretation advocated by Elim and the State, the Commissioner would possess the authority to implement regulations even when the Board had expressly rejected those regulations. This in effect would give the Commissioner a veto over the Board.

The Commissioner's emergency powers do not explicitly include any veto over Board decisions.[9] Under both subsections of AS 16.05.060, any veto power must be implied.

However, implication of such a grant of power to the Commissioner would eviscerate powers explicitly granted to the Board under AS 16.05.251. The Legislature's goal would be frustrated. Because the Commissioner could veto any act taken by the Board, the Board would become a mere rubber stamp or advisory body for the Commissioner.

Stated differently, rules of statutory construction do not permit an interpretation of AS 16.05.060 which effectively nullifies the explicit grant of power to the Board under AS 16.05.251. Implying a grant of veto power to the Commissioner under AS 16.05.060 would have just that effect. "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." 2A Norman J. Singer, *Sutherland Statutory Construction* § 46.06 (5th ed. 1992) (citations omitted). Inferring a broad veto power would make superfluous the detailed provisions dividing power and authority within the Department. *See* AS 16.05.050; AS 16.05.241; AS 16.05.251. It would make insignificant the statutory device for resolving disagreements between the Board and the Commissioner. AS 16.05.270. Indeed, it would seem to make inoperative the entire concept of the Board delegating its regulatory powers.

We conclude that the superior court correctly identified the Commissioner's emergency powers and the limits on those powers. This holding does not impact the Commissioner's authority to exercise his emergency powers in a true biological emergency. However, it does circumscribe his ability to override the Board's decisions where he is relying on evidence already presented to and reviewed by the Board.

the Commissioner do not give the Commissioner a veto over the action of the Board. This would be contrary to the statutory structure and purpose of the Department. . . . [T]he Commissioner's emergency powers to close a fishery may be invoked only when new evidence or events reveal a threat to the resource and there is insufficient time for a formal regulatory response by the Board.

9. PMA cites *Kenai Peninsula Fisherman's Cooperative Ass'n v. State,* 628 P.2d 897 (Alaska 1981),

for this proposition. In that case, the Board and Commissioner together sought the same result. The court's conclusion that "the Commissioner may use the emergency order process to implement a properly adopted management policy" does not necessarily mean that the Commissioner may only use his emergency powers in conformity with the Board's decision. *See id.* at 907. In that case the court simply did not address the issue of a dispute between the Board and the Commissioner.

### D. THE BOARD MADE A FINAL DETERMINATION TO NOT LOWER THE CHUM CAP FOR THE 1994 SEASON

As we have concluded that the Commissioner does not have the authority to effectively veto a decision of the Board, the only question left to address is whether the Board officially decided not to lower the chum cap in accordance with the management plan submitted by the Commissioner. According to the superior court, the Board "explicitly voted to reject the Commissioner's proposal." PMA agrees with this characterization.[10] However, Elim argues that "since there was no vote by four members of the Board on this matter, there was no *formal* decision by the Board." The State appears to concede that the Board made a decision.

Elim correctly argues that AS 16.05.320 requires that "a majority of the full board membership is required to carry all motions, regulations, and resolutions." AS 16.05.320. Thus, a vote of three to two would not have sufficed to have carried the Commissioner's proposal. However, where an amendment is offered and it does not receive the required number of votes, and then the proposal as a whole is voted on and is approved by the requisite majority, a decision has been made to reject the amendment. *See Robert's Rules of Order Newly Revised* § 12 (9th ed. 1990). The Board may have voted three to two to deny the chum cap reduction, but it voted five to zero to approve the management plan for the 1994 False Pass fishery without a chum cap reduction. Thus, we agree with the superior court that there was a decision by the Board to reject the Commissioner's proposal. If the Commissioner were to institute such a chum cap, based solely on the information he had already presented to the Board, he would be vetoing the Board's decision not to reduce the chum cap.

### III. *CONCLUSION*

We AFFIRM the superior court's decision and hold that the Commissioner may not use his emergency powers to implement a fisheries management program already considered and rejected by the Board, in the absence of newly developed information or events occurring after the Board's decision.

---

10. PMA submitted unsigned "draft findings" from the Board's March meeting which support the conclusion that the Board explicitly rejected the lower chum cap. Attached was an affidavit from Board member Laird Jones stating that the draft findings had been "approved" by four members and would be "adopted" at the October 1994 meeting. Elim objects to the use of this document because (1) one of the approving members was disqualified and another member "has since failed to be confirmed by the Legislature," and (2) "neither the State nor PMA relied on the draft" before the superior court. Elim cites no authority on these points. The State does not object to use of the draft findings. It is clear from the transcript of the Board's March 1994 meeting that the Board considered a number of conservation options and that they failed to adopt the Commissioner's suggested limit. As we do not need to rely on the draft findings, we need not address Elim's concerns about the validity of these documents.