**Mike O'CALLAGHAN, Appellant,**

**and**

**Milford D. Sweat, Appellant,**

v.

**Frank RUE, in his official capacity as Commissioner of Fish & Game, Appellee.**

**Nos. S-8234, S-8274.**

Supreme Court of Alaska.

Feb. 18, 2000.

Rehearing Denied April 18, 2000.

---

Mike O'Callaghan, pro se, Anchorage.

William E. Caldwell, Alaska Legal Services Corporation, Fairbanks, for Appellant Milford D. Sweat.

Steven A. Daugherty, Assistant Attorney General, Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, and BRYNER, Justices.

## *OPINION*

MATTHEWS, Chief Justice.

### I. *INTRODUCTION*

Alaska Statute 16.05.831 prohibits the waste of salmon, meaning the failure to use most of the salmon carcass.[1] This appeal concerns whether the Commissioner of Fish and Game had the authority to promulgate 5 Alaska Administrative Code (AAC) 93.320, involving salmon roe stripping, and whether the regulation is consistent with the salmon waste law. We conclude that the Commissioner had this authority and that 5 AAC 93.320 is valid.

### II. *FACTS AND BACKGROUND INFOR-MATION*

The state legislature created Alaska's private non-profit (PNP) salmon hatchery program in 1976 to boost Alaska's salmon har-

---

1. AS 16.05.831 provides as follows:

(a) A person may not waste salmon intentionally, knowingly, or with reckless disregard for the consequences. In this section, "waste" means the failure to utilize the majority of the carcass, excluding viscera and sex parts, of a salmon intended for

(1) sale to a commercial buyer or processor;

(2) consumption by humans or domesticated animals; or

(3) scientific, educational, or display purposes.

(b) The commissioner, upon request, may authorize other uses of salmon that would be consistent with maximum and wise use of the resource.

(c) A person who violates this section or a regulation adopted under it is punishable by a fine of not more than $10,000, or by imprisonment for not more than six months, or by both. In addition, a person who violates this section is subject to a civil action by the state for the cost of replacing the salmon wasted.

vest. A comprehensive statutory scheme governs PNP hatcheries;[2] currently, about thirty PNP salmon hatcheries in Alaska operate under this program. Yet since the start of the program, market conditions for salmon have changed dramatically. Worldwide salmon production has tripled, and as overall numbers of salmon increased and hatchery fish comprised a greater percentage of available fish, market prices for some species of salmon have dramatically declined. Especially depressed are the markets for pink and chum salmon. The Department of Fish and Game (the Department) and salmon hatchery operators thus claim that roe stripping—the practice challenged in this appeal—is necessary to the economic survival of both individual hatcheries and the entire PNP program.

Roe stripping occurs when a salmon's eggs—the roe—are removed from the fish (usually to be sold for human consumption) and the flesh is discarded. Although the practice was traditionally disfavored, increases in the number of hatchery chum and pink salmon and corresponding decreases in market value for these fish, together with increasing value of caviar, have made roe stripping more attractive.

Salmon physiology also contributes to this trend. Once a salmon nears the end of its lifespan and becomes exposed to fresh water, its flesh deteriorates in quality and can become extremely difficult, sometimes impossible, to sell. Yet because salmon at this stage convert nutrients into egg production, the roe remains of high quality even after the flesh has deteriorated. With poor market conditions, a high percentage of the value of a salmon can come from its roe.

Additionally, in recent years the harvests of chum and pink salmon have been so large that hatchery owners claim they have been unable to sell all of their salmon. Thus, faced with unmarketable salmon filled with lucrative eggs, hatchery operators find that their best economic option is to roe strip.

Before 1994, the Department of Fish and Game consistently interpreted the salmon waste law to prohibit all forms of roe stripping. In 1994, in response to the growing problem of excess, unmarketable hatchery salmon, the legislature considered—but failed to enact—a bill that would have modified the salmon waste law so as to authorize the Commissioner of Fish and Game to issue permits for roe stripping from hatchery salmon determined to have flesh that was "unfit for human consumption."[3]

When this legislation failed, the Department modified its interpretation of the waste law and issued six permits allowing PNP hatcheries to strip roe from surplus brood stock salmon.[4] The Commissioner asserted that this policy was authorized by AS 16.05.831(b) because he had determined "that the salvage of roe from surplus brood stock in the hatchery raceways is consistent with maximum and wise use of the resource." No regulations were enacted to govern the issuance of these permits.

After considering several interpretations of AS 16.05.831 (the salmon waste law)—including one that would exempt all PNP hatcheries from the roe stripping restriction—the Department formed a working group to formulate regulations interpreting the salmon waste law. The group was unable to reach agreement on whether roe stripping should be authorized. Then, the Department again unsuccessfully sought to introduce legislation clarifying the salmon waste law and authorizing some forms of roe stripping. Finally, when this failed, the Department promulgated regulations 5 AAC 93.310–93.390 addressing roe stripping.[5] One of these regulations,

---

2. *See* AS 16.10.375—16.10.480; 5 AAC Ch. 40.

3. House Bill (H.B.) 448, 18th Leg., 2nd Sess. § 1 (Feb. 4, 1994).

4. Brood stock refers to salmon used to repopulate hatchery fish stocks. Both the Food and Drug Administration and the Alaska Department of Environmental Conservation classify brood stock salmon at this stage of life as unfit for human consumption.

5. For a brief period before the permanent regulations became effective, roe stripping was governed by emergency regulations of essentially the same substance. These temporary regulations are not challenged on appeal. Nor is there any claim that the permanent regulations do not comply with the Administrative Procedure Act, AS 44.62.

5 AAC 93.320, is the focal point of this appeal.

Regulation 5 AAC 93.320 authorizes the Commissioner to issue permits allowing some salmon hatcheries to engage in roe stripping of salmon:

(a) Notwithstanding AS 16.05.831(a) and 5 AAC 93.310, a hatchery operator may remove and sell pink and chum salmon roe for cost recovery purposes, and dispose of the carcasses of the salmon, under the terms of the authorization embodied in this section.

(b) This section's authorization applies only to pink and chum salmon that

(1) originated from a hatchery;

(2) are harvested by a hatchery operator in a hatchery terminal area or hatchery special harvest area;

(3) have matured to the point that their flesh cannot be marketed without an unreasonable risk of incurring a financial loss; and

(4) cannot be put to other lawful use or be given away despite compliance with the requirements of this section.

. . . .

(o) In this section, "unreasonable risk of incurring a financial loss" means that a hatchery permit holder reasonably determines that, for a given lot of fish, as designated by the hatchery, net profits from putting the salmon to lawful use and from selling the roe removed from the salmon, could be lower than needed to justify the diversion of hatchery personnel and resources, including overhead and administrative resources, to deal with the salmon.

The regulation requires a hatchery to document the estimated numbers of salmon returning to the hatchery, any attempts made to find lawful uses for the fish, and predicted financial losses if not allowed to roe strip.[6] The regulation also mandates specified efforts to distribute salmon to food banks and the public, as well as record keeping.[7] This regulation became effective on July 21, 1996,[8] and the Commissioner issued permits pursuant to it throughout the 1996 salmon season, allowing PNP processors to strip roe from "unmarketable and otherwise unusable chum salmon."

## III. *PROCEEDINGS*

Mike O'Callaghan, an officer of the nonprofit organization EARTH, sued the Commissioner of Fish and Game for injunctive relief in November 1996. O'Callaghan, a pro se litigant, argued primarily that hatchery roe stripping violated the salmon waste law, AS 16.05.831; he wanted EARTH to receive the discarded salmon so that it could be used to feed the needy. Milford Sweat, a commercial Yukon River fisher, intervened, seeking declaratory relief invalidating the Commissioner's authorization of roe stripping. The superior court granted summary judgment in favor of the Commissioner on the validity of the regulation.

O'Callaghan and Sweat argue on appeal that the Commissioner promulgated the roe stripping regulation (5 AAC 93.320) without the required statutory authority and that the regulation violates the salmon waste law and other statutory and constitutional provisions. O'Callaghan and Sweat also argue that the Department maintains a practice and policy generally permitting roe stripping from excess brood stock salmon in violation of the salmon waste law. Finally, O'Callaghan contends that the superior court erred by refusing to allow him to amend his complaint, by relying on facts unsupported by the evidence, and by refusing to mandate the enforcement of the salmon waste law.

## IV. *DISCUSSION*

### A. *The Validity of 5 AAC 93.320*

### 1. *Mootness*

■ Regulation 5 AAC 93.320, by its terms, applied only to the 1996 and 1997

---

6. *See* 5 AAC 93.320(c)(1).

7. *See* 5 AAC 93.320(d). Alternatively, the hatchery operator may transport 100 salmon carcasses or an amount sufficient to meet public and food bank demand, whichever is greater, and then may immediately dispose of other pink or chum salmon carcasses. The hatchery operator must keep the transported salmon refrigerated, maintain fresh supplies by replacing the salmon at least every 72 hours, and replenish the supply of salmon in quantities sufficient to meet public and food bank demand. *See* 5 AAC 93.320(e).

8. *See* 5 AAC 93.320.

salmon seasons.[9] Therefore, we must determine whether this question is moot. "Ultimately the determination of whether to review a moot question is left to the discretion of the court." [10] The present issue is capable of repetition and, because of the short-term nature of the regulation, might repeatedly circumvent judicial review. Furthermore, precedent indicates that the issues involved in 5 AAC 93.320 are sufficiently significant, because they are related to the "allocation of Alaska's fishery resources." [11] Similarly, we have noted that "the scope of the Commissioner's power is an issue of public interest." [12] We thus review this case under the public interest exception to the mootness doctrine.

### 2. *Standard of review*

This court reviews grants of summary judgment de novo.[13] To affirm, we must find that there are no material facts at issue and that the movant is entitled to judgment as a matter of law.[14]

■ Here, we are asked to review the validity of administrative regulations. This court applies a three-part analysis to this question.

■ First, we must determine whether the legislature delegated to the administrative agency the authority to promulgate regulations.[15] Determining the extent of an agency's authority involves the interpretation of statutory language, a function uniquely within the competence of the courts.[16] Thus, this court applies its independent judgment to the question of the authority to adopt regulations.[17]

■ Once we are satisfied that the agency acted within the scope of its delegated power, we then consider whether "the regulation is consistent with and reasonably necessary to implement the statutes authorizing its adoption" [18] and whether it is reasonable and not arbitrary.[19] In making the consistency determination, the court exercises its independent judgment, unless the issue involves agency expertise or the determination of fundamental policy questions on subjects committed to an agency.[20] In cases involving agency expertise or fundamental policy questions, we employ a rational basis standard under which we defer to the agency's determination so long as it is reasonable.[21] We believe that the question of whether 5 AAC 93.320 is consistent with the underlying salmon waste law is one of statutory interpretation to which we should apply our independent judgment.[22] Whether the regulation is necessary to implement the statute involves fundamental policy determi-

9. 5 AAC 93.320(p) provides that "[t]he provisions of this section do not apply after December 31, 1997."

10. *Kodiak Seafood Processors Ass'n v. State*, 900 P.2d 1191, 1196 (Alaska 1995) (citations omitted).

11. *Peninsula Mktg. Ass'n v. State*, 817 P.2d 917, 920 (Alaska 1991).

12. *Kodiak Seafood*, 900 P.2d at 1196.

13. *See Payton v. State*, 938 P.2d 1036, 1041 (Alaska 1997).

14. *See Alaska Fish Spotters Ass'n v. State, Dep't of Fish & Game*, 838 P.2d 798, 800 (Alaska 1992).

15. *See Warner v. State*, 819 P.2d 28, 30–31 (Alaska 1991).

16. *See Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903–04 (Alaska 1987)

(quoting *Union Oil Co. of Cal. v. Department of Revenue*, 560 P.2d 21, 23 (Alaska 1977)).

17. *See id.* at 904.

18. *Chevron U.S.A. Inc. v. LeResche*, 663 P.2d 923, 927 (Alaska 1983); *see also* AS 44.62.030 (providing that "a regulation adopted is not valid or effective unless consistent with the statute and reasonably necessary to carry out the purpose of the statute").

19. *See State v. Anderson*, 749 P.2d 1342, 1344 (Alaska 1988); *Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971).

20. *See Gunderson v. University of Alaska, Fairbanks*, 922 P.2d 229, 233 (Alaska 1996); *Tesoro*, 746 P.2d at 903.

21. *See Gunderson*, 922 P.2d at 233; *Tesoro*, 746 P.2d at 903.

22. *See Board of Trade, Inc. v. State, Dep't of Labor, Wage & Hour Admin.*, 968 P.2d 86, 89 (Alaska 1998).

nations which we review on a rational basis standard.[23] Likewise, we conduct the "reasonable and not arbitrary" review using a deferential standard.

■ Finally, we consider whether the regulation conflicts with any other state statutes or constitutional provisions.[24] Whether a regulation violates a constitutional or statutory provision is a legal question we review de novo.[25]

■ We presume the validity of an administrative regulation; the challenger bears the burden of proving it is invalid.[26]

3. *Does the Commissioner of Fish and Game have authority to promulgate regulations?*

■ Statutory authority to promulgate rules may be either express or implied.[27] O'Callaghan and Sweat argue that only the Board of Fisheries (the Board), and not the Commissioner, has the authority to promulgate regulations involving PNP hatchery salmon and roe. The Department claims that the Commissioner has implied authority to promulgate rules under AS 16.05.020 and express rulemaking powers under AS 16.05.831. We agree with the Department.

Alaska Statute 16.05.020 outlines generally the functions of the Commissioner, directing him to "manage, protect, maintain, improve, and extend the fish ... resources of the state in the interest of the economy and general well-being of the state" and giving him the "necessary power to accomplish" those directives.[28] This language grants the Commissioner broad authority "relat[ing] principally to administration and budgeting," while primary rulemaking authority is allocated to the Board.[29]

Nevertheless, subsection (b) of the salmon waste law explicitly delegates to the Commissioner the authority to enforce and interpret the law: "The commissioner, upon request, may authorize other uses of salmon that would be consistent with maximum and wise use of the resource." [30] Subsection (c) specifically envisions the promulgation of rules under section .831 by prescribing civil and criminal penalties for "[a] person who violates this section *or a regulation adopted under it.*" [31] Subsections (b) and (c) reflect a clear legislative intent that regulations should be adopted under AS 16.05.831 and that the Commissioner is the official responsible for the law's implementation. Together with the Commissioner's general authority to manage fishery resources in the state, this statute delegates rulemaking authority to the Commissioner.

We note that the Board has authority to "adopt regulations it considers advisable in accordance with AS 44.62 (Administrative Procedure Act)" in a wide variety of fishery-related areas, including "regulating commercial, sport, guided sport, subsistence, and personal use fishing as needed for the conservation, development, and utilization of fisheries." [32] However, the PNP hatchery program is permit-based. To operate a hatchery, a non-profit organization must obtain a permit and comply with a variety of statutory conditions regulating hatchery development and operation.[33] The statutes place the responsibility for issuing, suspending, and revoking permits with the Commissioner, not the Board.[34] The power to modify permit terms is shared. It lies with the

23. *See State, Dep't of Revenue v. Cosio,* 858 P.2d 621, 624 n. 1 (Alaska 1993).

24. *See Anderson,* 749 P.2d at 1344.

25. *See Church v. State, Dep't of Revenue,* 973 P.2d 1125, 1127 (Alaska 1999); *Alaska Fish Spotters,* 838 P.2d at 800.

26. *See Cosio,* 858 P.2d at 624.

27. *See* AS 44.62.030; *see also Usibelli Coal Mine, Inc. v. State, Dep't of Natural Resources,* 921 P.2d 1134, 1143 (Alaska 1996).

28. AS 16.05.020(2)-(3).

29. *Peninsula Mktg. Ass'n v. Rosier,* 890 P.2d 567, 572 (Alaska 1995).

30. AS 16.05.831(b).

31. AS 16.05.831(c) (emphasis added).

32. AS 16.05.251(a)(12).

33. *See generally* AS 16.10.400–16.10.470.

34. *See* AS 16.10.400(a)(1) ("The commissioner or a designee may issue a permit, subject to the restrictions imposed by statute or regulation under AS 16.10.400–16.10.470 ... [for] the con-

Commissioner in the first instance,[35] but is subject to ultimate control by the Board.[36]

Sweat argues that the Commissioner's promulgation of 5 AAC 93.320 is invalid because, under *Peninsula Marketing Association v. Rosier*,[37] "[e]ven where the Commissioner has been given specific regulatory authority . . . the Commissioner is not endowed with a 'veto power' over the Board." But the present case is not analogous to *Rosier*. In *Rosier*, the Board evaluated and, after public testimony, rejected the Commissioner's proposed cap on chum fishing, implementing instead a set of alternative conservation measures.[38] Subsequently, on the governor's instruction, the Commissioner instituted his originally proposed cap using his emergency powers.[39] We held that to allow the Commissioner the "veto power" to override the Board's reasoned rejection of the chum cap would "eviscerate powers explicitly granted to the Board."[40] But there is no evidence that the Board ever considered enacting the presently contested regulation. Furthermore, that the legislature considered legislation but failed to act also does not change this result; *Rosier* only concerned the balance of power between the Commissioner and the Board.

Because the legislature granted the Commissioner authority to promulgate rules under AS 16.05.020 and 16.05.831, we hold that the Commissioner has the authority to promulgate the regulation in question.

4. *Is 5 AAC 93.320 consistent with the salmon waste law?*

O'Callaghan and Sweat urge us to view the discretionary powers authorized by subsec-

tion (b) of the salmon waste law[41] as narrowly limited. They contend that subsection (a) constitutes a wholesale prohibition of any use of salmon that does not utilize most of the carcass and that the Commissioner has no discretion under subsection (b) to authorize any use which entails discarding carcasses. O'Callaghan and Sweat argue that AS 16.05.831(a) unambiguously defines waste in a way that clearly precludes roe stripping. Under this reading, the Commissioner could, for example, allow salmon flesh to be used for fertilizer, bait, or fish meal,[42] but could not authorize any activity—such as roe stripping—which does not use most of the flesh.

The Department argues that subsection (b) authorizes the Commissioner to permit uses of salmon which may entail the disposal of salmon carcasses so long as the permitted use is consistent with the "maximum and wise use of the [salmon] resource."[43] It contends that many scientific, educational, and display purposes involve the disposal of salmon carcasses, offering as examples the study of salmon digestive and reproductive systems and mounting of trophy salmon. Since these uses are presumably permissible under subsection (a), the Department argues that other uses which also involve disposal of carcasses may be permitted under (b). It also contends that hatchery brood stock salmon carcasses have long been discarded after roe or milt is extracted. Under the appellants' reading of the statute this practice would be forbidden even though the carcasses are without economic value.

The superior court held that "the statute clearly authorizes the Commissioner to pro-

struction and operation of a salmon hatchery. . . . "); AS 16.10.430(a) ("If a permit holder fails to comply with the conditions and terms of the permit . . ., the permit may be suspended or revoked, in the discretion of the commissioner. . . .").

35. *See* AS 16.10.430(b) ("If the commissioner finds that the operation of the hatchery is not in the best interests of the public, the commissioner may alter the conditions of the permit to mitigate the adverse effects. . . .").

36. *See* AS 16.10.440(b) ("The Board of Fisheries may . . . amend by regulation . . . the terms of the permit. . . .").

37. 890 P.2d 567 (Alaska 1995).

38. *See id.* at 568–69.

39. *See id.* at 569.

40. *Id.* at 573.

41. The text of the salmon waste law is set forth in note 1, *supra.*

42. The Commissioner has indeed authorized these uses of salmon under AS 16.05.831(b). *See* 5 AAC 93.350(a)-(b).

43. AS 16.05.831(b).

mulgate regulations authorizing *any* activity which reasonably results in the 'maximum and wise use of the resource.'" (Emphasis in original.) The court viewed subsection (b) as a "broad legislative authorization to the Commissioner to act in the public interest in response to a variety of circumstances."

We believe that the question presented is both close and difficult. Section .831 is not clearly written. Taken literally, subsection (a) seems to prohibit the failure to utilize only the carcasses of salmon *intended* for the purposes enumerated in subparagraphs (1) through (3). What does this imply about the utilization of carcasses of salmon taken for other purposes, such as hatchery propagation or bait? There are at least two possibilities. One possibility is that the carcasses of salmon taken or "intended" for other purposes need not be utilized. Another possibility is that subparagraphs (1) through (3) are meant to define the permissible purposes for which salmon may be harvested. The first would permit the waste of any salmon not intended for the enumerated purposes. The latter reading is less literal, but it is more likely what the legislature intended. Under this latter reading, subsection (a) has two functions: it defines permissible purposes for which salmon may be harvested (and thus impliedly prohibits their harvest for other purposes) and requires that the carcasses of salmon taken for permitted purposes be utilized for those purposes.

If we accept that subsection (a) both defines permitted purposes and mandates carcass use for those purposes, what is to be made of subparagraph (a)(3)? As the Department represents, this provision authorizes some uses which ultimately involve the disposal of salmon carcasses. One possible answer is that scientific, educational, or display purposes "utilize" salmon carcasses within the meaning of the statute even if the only use of the carcass is as a disposable holder of the viscera or skin. Alternatively, the statute may imply that the flesh must be saved for other permitted uses to the extent that this is practical given the uses permitted under subparagraph .831(a)(3).[44] For our purposes in this case, this is an issue that needs only to be noted, not resolved.

Turning to subsection (b), it most literally seems to be a grant of authority to the Commissioner to add other uses to those listed in subparagraphs (1) through (3) of subsection (a). If we accept the dual purpose interpretation of subsection (a)—that it both defines permitted purposes for which salmon may be taken and requires that the carcasses of salmon taken for permitted purposes be utilized—the same applies to additional uses authorized by the Commissioner pursuant to subsection (b). For discussion purposes, assume that the Commissioner added "hatchery propagation" to the list. Could carcasses of salmon be discarded after roe or milt were extracted? This question is much the same as that posed by subparagraph (a)(3), discussed above. Either hatchery propagation is a permitted utilization of the salmon carcass in itself, even though the carcass is eventually thrown away, or the flesh must be used for other permitted purposes to the extent practical given the intended hatchery propagation use.

Now consider the current case. The Commissioner has defined as a use the taking and sale of roe from hatchery salmon caught by hatcheries in terminal or special harvest areas if the salmon have no other practical use. Can the carcasses of these salmon be discarded? Based on the preceding discussion, the answer is "yes." Either the taking and sale of roe is a permitted utilization of the carcass in itself, in the same way that a carcass can be said to be utilized in hatchery propagation, or the carcass must

---

**44.** Compare AS 16.10.173(d)(3), which prohibits herring waste but contains language that seems to exclude from the definition of waste loss of flesh inherent in permitted uses:

"waste" means the failure to use the flesh of commercially taken herring for reduction to meal, production of fish food, human consumption, food for domestic animals, scientific or educational purposes, or round herring bait.

Normal, inadvertent loss of flesh associated with the uses described in this subsection that cannot be prevented by practical means does not constitute waste. The commissioner may authorize other uses of commercially taken herring consistent with the intent of this section and AS 16.10.172 upon receipt of a request accompanied by a detailed justification.

be used to the extent practical in association with the taking and sale of roe. If the law only requires the former alternative, the taking of roe is a satisfactory utilization of the carcass. If the law requires the latter alternative, the contested regulation complies because the Commissioner has only permitted roe stripping where there are no other practical permitted uses of the carcass. We therefore conclude that regulation 5 AAC 93.320 is consistent with AS 16.05.831.

■ We also hold that the Department could rationally find the contested regulation reasonably necessary to implement the salmon waste law. The Department argues that, due to the current market conditions for hatchery salmon, roe stripping is the wisest, and the least wasteful, use for salmon that would otherwise not be used at all: "harvesting and recovering value from the unmarketable salmon was less wasteful—and more consistent with protection of the salmon resource—than allowing the salmon to remain in the water, completely unused, where they could interfere with natural salmon stocks and could also cause public nuisances." We defer to the Commissioner's determination that sale of roe from unmarketable fish is a "maximum and wise use" of salmon.[45]

■ Finally, we hold that the regulation is reasonable and not arbitrary. This inquiry considers whether "the agency has taken a

'hard look' at the salient problems and has 'genuinely engaged in reasoned decision making.'"[46] The regulation clearly passes this test. The Department engaged in extensive correspondence with other state agencies regarding its proposed regulations, promulgated them under the Administrative Procedure Act, revised the proposed regulations in response to public notice and comment, and formed a working group (in which O'Callaghan participated) to review policies on the sale of salmon roe. Under these circumstances, the Department's process for promulgating 5 AAC 93.320 was reasonable.[47]

5. *Does 5 AAC 93.320 violate any other state statute or constitutional provisions?*

To be valid, an administrative regulation must not violate existing state statutes or constitutional provisions. Sweat and O'Callaghan assert that 5 AAC 93.320 violates the common use clause of the Alaska Constitution,[48] the statutory market parity requirement,[49] and the Pacific Marine Fisheries Compact.[50] We find these contentions unconvincing.

i. *The common use clause*

■ O'Callaghan claims that 5 AAC 93.320 violates the Alaska Constitution's common use clause, article VIII, section 3, which

---

45. As we said in *State, Department of Revenue, Permanent Fund Dividend Division v. Cosio,* 858 P.2d 621, 624 n. 1 (Alaska 1993):

 If we find the proper nexus between the challenged regulation and the statutory purpose (i.e., the regulation is consistent with the statutory purpose), we do not generally require a separate showing of reasonable *necessity.* Strictly applied, inquiry into whether a regulation is *necessary* as a means to a legislative end would mire this court in questions of public policy and the advisability of possible alternatives. Such a searching inquiry is beyond our authority and expertise. It is a rare case where a regulation, although not inconsistent with the purpose of the statute, is wholly superfluous to the achievement of that purpose. (Emphasis in original.)

46. *Stepovak–Shumagin Set Net Ass'n v. State, Bd. of Fisheries,* 886 P.2d 632, 637 (Alaska 1994) (quoting *Gilbert v. State, Dep't of Fish & Game,* 803 P.2d 391, 398 (Alaska 1990)).

47. On December 16, 1998, this court issued a sua sponte order asking the parties to file supple-

mental briefs to address whether AS 16.10.440(a) exempts hatchery fish from generally applicable laws, including the salmon waste law, once the fish return to the designated harvest areas. Alaska Statute 16.10.440(a) provides:

 Fish released into the natural waters of the state by a hatchery operated under AS 16.10.400—16.10.470 are available to the people for common use and are subject to regulation under applicable law in the same way as fish occurring in their natural state *until they return to the specific location designated by the department for harvest by the hatchery operator.* (Emphasis added.) Because none of the parties argue in favor of this application, we express no opinion as to whether this statute applies.

48. *See* Alaska Const., art. VIII, § 3.

49. *See* AS 16.10.450(b).

50. *See* AS 16.45.020.

mandates that "[w]herever occurring in their natural state, fish, game, waters and wildlife are reserved to the people for their common use." But the challenged roe stripping regulation does not apply to salmon which are caught while "occurring in their natural state." Instead, the regulations apply only to hatchery-produced salmon once they have returned to a special hatchery area.[51] Pursuant to AS 16.10.440,[52] the salmon remain subject to the common use clause while in the natural waters of the state. Since the common use clause by its terms does not apply to hatchery fish in terminal areas, this claim lacks merit.

### ii. *The market parity requirement*

Sweat and O'Callaghan also contend that allowing roe stripping contravenes the statutory requirement of "market parity" for hatchery fish. We disagree.

Alaska Statute 16.10.450(b) mandates that "[f]ish returning to hatcheries and sold for human consumption shall be of comparable quality to fish harvested by commercial fisheries in the area and shall be sold at prices commensurate with the current market."[53] Since the salmon carcasses in question are not "sold for human consumption," this requirement is inapplicable to the carcasses.

With regard to the roe, O'Callaghan and Sweat complain that PNP hatcheries should not be able to sell roe that is only available if the fish mature to the point of being unmarketable. O'Callaghan argues that the roe increase in number and quality as the flesh decays, and thus roe sold from stripped fish is not of comparable quality to those produced by other fishers. Sweat similarly argues that the relevant "current market" for salmon is one in which the salmon flesh can be put to some use other than being discarded. Essentially, this is an argument that 5 AAC 93.320 allows PNP hatcheries to obtain unfair market advantage by producing roe that is of *higher* quality than can be obtained by traditional means, thus violating the market parity requirement. In our view this argument lacks merit. The aim of subsection .450(b) is to prevent hatcheries from over-saturating the market with poor quality salmon and thus adversely affecting the reputation of Alaska salmon.[54] It was not intended to and does not prevent hatcheries from selling a superior product.

### iii. *The Pacific Marine Fisheries Compact*

Third, O'Callaghan argues that 5 AAC 93.320 violates the Pacific Marine Fisheries Compact, codified at AS 16.45.020. He points to provisions in the Compact which promote "prevention of physical waste of the fisheries,"[55] "prevention of the depletion" of fish resources,[56] and "protection [of fisheries] against overfishing, waste, depletion, or any abuse whatsoever."[57] But the salmon waste law is both more recent and more specific to the salmon resource.[58] The salmon waste law reiterates the prohibition against wasting salmon and grants the Commissioner authority to "authorize other uses of salmon that would be consistent with maximum and wise use of the resource."[59] The meaning of the salmon waste law controls this case to the extent that it may be inconsistent with the Compact.

### B. *Excess Brood Stock Roe Stripping*

O'Callaghan and Sweat also raise claims specifically related to roe stripping of brood stock salmon. They allege that the Department maintains an informal policy and practice of allowing roe stripping of excess brood stock salmon and that the policy violates the

---

51. *See* 5 AAC 93.320(b)(2).

52. AS 16.10.440(a) is set forth in note 47, *supra*.

53. AS 16.10.450(b).

54. *See Operation of Private Non–Profit Hatcheries, Hearings on H.B. 830 Before the House Judiciary Comm.*, 8th Leg., 2d Sess. (April 15, 1974) (minutes of the committee meeting).

55. AS 16.45.020, art. I.

56. *Id.* at art. IV.

57. *Id.*

58. Generally, "a more specific statute governs over an otherwise applicable general statute." *Jenkins v. Daniels*, 751 P.2d 19, 22 (Alaska 1988).

59. AS 16.05.831(b).

salmon waste law and the Administrative Procedure Act.

The Department contends that except under the conditions specified in 5 AAC 93.320 it no longer permits roe stripping from excess brood stock, i.e., salmon that were caught for purposes of propagation but whose roe were never used. The Department distinguishes between surplus brood stock and roe that are unsuitable for fertilization:

> A hatchery operator will normally collect more fish for brood stock than ultimately is needed and used for this propagative purpose. This is not an abuse, but simply is the result of the prudent management practice of ensuring the collection of a sufficient number of fish for propagative purposes. Because of uncertainties surrounding brood stock collection . . ., it is necessary to provide for some margin of error. . . .
>
> . . . . If fish are set aside for brood stock purposes but ultimately are not used during brood stock operations, a hatchery operator must now comply with AS 16.05.831 and the new salmon waste regulations . . . in the use and/or disposal of the carcasses of these fish.

On the other hand, "[d]uring brood stock operations a number of salmon selected as brood stock are found to contain unripe eggs that are not suitable for fertilization. The percentage of unripe eggs frequently approaches ten percent." Under 5 AAC 40.010(b), hatchery operators may discard the carcasses of salmon actually used for propagative purposes.[60] According to the Department's interpretation, this includes "the discard of fish that are found to contain unripe eggs that are not suitable for fertilization."

Although hatcheries were allowed to strip roe from excess brood stock salmon under 5 AAC 40.010(b) before 1995, the Department's current interpretation of that regulation is that excess brood stock are subject to 5 AAC 93.320. As an issue separate from the validity of this regulation, appellants' arguments concerning excess brood stock roe stripping are moot.

■ Sweat also argues that the Department may not authorize the commercial sale of roe, in light of AS 16.10.420(7). He contends that this statute only permits the sale of salmon eggs to the Department or to another hatchery for propagative purposes.[61] But this statute does not prohibit the commercial sale of roe; rather, the statute prioritizes to whom the roe may be sold. So long as the statutory priorities are observed, AS 16.10.420(7) does not prohibit general commercial sale.

### C. Refusal to Allow Amendment of O'Callaghan's Complaint

■ O'Callaghan also claims the superior court erred when it declined to allow him to amend his prayer for relief to include invalidation of a set of guidelines issued by the Department of Environmental Conservation (DEC) in May 1997. Alaska Civil Rule 15(a), governing amendment of pleadings, states that leave to amend pleadings "shall be freely given when justice so requires." Although leave should be liberally granted, trial courts have discretion to grant or deny leave to amend pleadings, and this court will reverse only if we are left with a definite and firm conviction that the trial court erred.[62]

---

**60.** Regulation 5 AAC 40.010(b) provides:

Hatchery permit holders harvesting salmon within a special harvest area, to the extent those salmon are used as egg sources for brood stock, will be exempted by the commissioner from the provisions of AS 16.05.831 if the permit holder so requests. The commissioner may condition the exemption on terms he considers necessary to carry out the intent of AS 16.05.831.

See also 5 AAC 93.350(c) ("Notwithstanding AS 16.05.831(a) and 5 AAC 93.310, a person may dispose of the carcass of a salmon from which milt or eggs are extracted under a permit issued

under AS 16.10.400–16.10.480 for lawful use as brood stock.").

**61.** AS 16.10.420(7) provides, "The department shall require, in a permit issued to a hatchery operator, that . . . surplus eggs from salmon returning to the hatchery be made available for sale first to the department and then, after inspection and approval by the department, to operators of other hatcheries. . . ."

**62.** See Alaska R. Civ. P. 15(a); Siemion v. Rumfelt, 825 P.2d 896, 898 n. 2 (Alaska 1992).

The trial court must ensure that neither party is prejudiced by granting or denying leave to amend; factors relevant to a finding of prejudice toward the non-moving party include added expense and delay, a longer or more burdensome trial, or "if the issues being raised in the amendment are remote from the scope of the original case."[63] Moreover, "courts are normally hesitant to allow amendments after summary judgment motions" and other dispositive motions have been filed.[64]

O'Callaghan's motion was filed on May 25, 1997, approximately one month after the State moved for summary judgment and after briefing and oral argument on all other issues had been completed. Moreover, although the DEC regulations at issue deal with hatchery salmon and their disposal, the legal question—whether DEC has "authority to issue edicts related to the suitableness or fitness of food"—is at best tangentially related to the primary claims in this lawsuit. Therefore, the superior court did not abuse its discretion by refusing to allow O'Callaghan to amend his pleadings.

### D. The Existence of Disputed Material Facts

Finally, O'Callaghan argues that the superior court "err[ed] by including so many alleged facts unsupported by the evidence as to render the opinion meaningless." We understand this as a contention that factual questions should have precluded summary judgment. However, O'Callaghan has not pointed to the existence of any disputed facts that are material. Any alleged factual disputes are irrelevant to the questions of law which are dispositive in this appeal. Therefore, summary judgment was appropriate.

## V. CONCLUSION

We conclude that the Commissioner of the Department of Fish and Game has authority to promulgate regulations under AS 16.05.831. The contested regulation—5 AAC 93.320—is consistent with this statute, as well as other constitutional and statutory provisions.[65] Accordingly, we AFFIRM the superior court's grant of summary judgment in favor of the Commissioner.

CARPENETI, Justice, not participating.

---

**63.** *Gamble v. Northstore Partnership*, 907 P.2d 477, 484 (Alaska 1995) (quoting *Estate of Thompson v. Mercedes–Benz, Inc.*, 514 P.2d 1269, 1271 (Alaska 1973)).

**64.** *Jennings v. State*, 566 P.2d 1304, 1312 (Alaska 1977).

**65.** Because we find the Department's practice legal, we need not address O'Callaghan's claim that we order enforcement.