49 P.3d 1111 (2002)
Tom LAKOSH, Appellant,
v.
ALASKA DEPARTMENT OF ENVIRONMENTAL CONSERVATION, Arco Marine, Inc., BP Oil Shipping Company, U.S.A., and Seariver Maritime, Inc., Appellees.
No. S-9619.
Supreme Court of Alaska.
June 28, 2002.
*1113 Tom Lakosh, Anchorage, Appellant, pro se.
Breck C. Tostevin, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee State of Alaska, Department of Environmental Conservation.
Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

OPINION ON REHEARING
BRYNER, Justice.

I. INTRODUCTION
In 1990, after the EXXON VALDEZ spilled more than 230,000 barrels of crude oil into Prince William Sound, the Alaska legislature strengthened Alaska's oil spill contingency plan statute by adding to the existing provisions, which required the use of "best available technology," a new provision that required all contingency plans to meet a set of specified response planning standards. After the Department of Environmental Conservation (DEC) adopted regulations to implement the new response standards and the best available technology requirement, Tom Lakosh sued DEC, challenging two aspects of its regulation defining best available technology. The superior court granted summary judgment to the state, and Lakosh appealed. Because the challenged regulation conflicts with the authorizing statute, we reverse and remand.

II. FACTS AND PROCEEDINGS
In 1980 the Alaska legislature, finding that "it is a matter of the highest urgency and priority to protect Alaska's coastal and inside water, estuaries, wetlands, beaches, and land from the damage which may be occasioned by the discharge of oil," enacted Alaska's Oil Pollution Control Act.[1] One provision of the Act, AS 46.04.030, required persons engaged in various oil-related activities to file and obtain DEC's approval of oil spill prevention and contingency plans.[2]
As originally enacted, this statute simply required that oil spill prevention and contingency plans "provide for the use of the best available technology by the applicant."[3] But in 1990, the year after the EXXON VALDEZ ran aground in Prince William Sound, the legislature strengthened the statute to require that all contingency plans meet legislatively specified response planning standards for containing, controlling, and cleaning up spills.[4] At the same time, the legislature retained a slightly modified version of the best available technology requirement, specifying that contingency plans "must provide for use ... of the best technology that was available at the time the contingency plan was submitted or renewed."[5]
The legislature left the phrase "best available technology" undefined but directed DEC to "establish the procedures and time limits applicable to agency review of contingency plans."[6] To address this directive, DEC formed a working group comprising various stakeholders from the regulated industries, environmental and other public interest groups, local governments, and DEC representatives. The group held public workshops, published notices of proposed regulations in various newspapers, and received comments regarding the regulatory definition of best available technology. Tom Lakosh participated in the workshops and submitted written comments voicing his disapproval *1114 of the regulations. But the regulations were ultimately adopted, and their definition of best available technology took effect on April 4, 1997.
Lakosh filed a declaratory judgment action in superior court, challenging the new definition of best available technology as inconsistent with the underlying statutory requirements set out in AS 46.04.030(e). Superior Court Judge John Reese granted summary judgment in favor of DEC, upholding the regulations. Lakosh appeals, challenging two aspects of the regulations' definition of best available technology.

III. DISCUSSION

A. Standard of Review
We review a grant of summary judgment de novo.[7] We exercise our independent judgment to determine whether administrative regulations are valid and to interpret the underlying statutory language.[8] When an agency has adopted regulations under a delegation of authority from the legislature and using the process prescribed by the Administrative Procedure Act,[9] we presume that the regulations are valid and place the burden of proving otherwise on the challenging party.[10] We limit our review to "whether the regulation[s][are] consistent with and reasonably necessary to carry out the purposes of the statutory provisions .... [and] whether the regulation[s][are] reasonable and not arbitrary."[11]
In making the consistency determination, we use our independent judgment unless the "issue involves agency expertise or the determination of fundamental policy questions on subjects committed to an agency."[12] If the issue involves agency expertise, we review under the reasonable basis standard and defer to the agency if its interpretation is reasonable.[13] We also employ rational basis review in deciding whether a regulation is necessary to implement the statute[14] and whether a regulation is reasonable and not arbitrary.[15]

B. Statutory and Regulatory Provisions
Alaska Statute 46.04.030(a) provides that "[a] person may not cause or permit the operation of an oil terminal facility in the state unless an oil discharge prevention and contingency plan for the facility has been approved by [DEC] and the person is in compliance with the plan."[16] Moreover, subsection.030(k) further requires that contingency plan holders be able to comply with specified standards. The subsection sets specific spill containment and cleanup response planning standards[17] and commands *1115 plan holders to maintain, or have available under contract, "sufficient oil discharge containment, storage, transfer, and cleanup equipment, personnel, and resources to meet" these standards.[18] DEC has adopted regulations setting analogous performance standards that plan holders must meet with respect to oil spill prevention.[19] And finally, subsection .030(e) requires that oil spill contingency plans also "provide for the use by the applicant of the best technology that was available at the time the contingency plan was submitted or renewed."
It is this latter provision, subsection.030(e)'s best available technology requirement, that is in controversy here. DEC chose to adopt a three-tiered approach for determining whether a contingency plan provides for the use of the best available technology.[20] The first tier of the definition, set out in 18 AAC 75.445(k)(1), covers cleanup and containment technology governed by the oil spill response planning standards mandated by AS 46.04.030(k); cleanup and containment technology included in this tier meets the best available technology requirement if it is capable of complying with the statutory cleanup and containment standards  that is, if the technology "as a whole" is "appropriate and reliable for the intended use as well as the magnitude of the applicable response planning standard."[21] The second tier of the definition, 18 AAC 75.445(k)(2), governs oil spill prevention technology, which is governed by the oil pollution prevention performance standards found in 18 AAC 75.005.080; with limited exceptions not relevant here, the oil spill prevention technology in this tier meets the best available technology requirement if it is capable of meeting the performance standards in the applicable oil spill prevention regulations.[22] The third tier of the definition, set out in 18 AAC 75.445(k)(3), covers remaining technology not subject to either the response planning standards or the prevention performance standards; in this tier, DEC determines whether the best available technology requirement has been met by undertaking a case-by-case evaluation based on specified criteria.[23]
Thus, the challenged regulation uses individualized analysis to determine compliance with the best available technology requirement only for those residual classes of technology included in the third tier of the definition.[24] For technologies covered in the first two tiers  those involved in almost all oil *1116 spill prevention, containment, and cleanup activities  compliance with the applicable standards essentially serves as a proxy for the best available technology determination.

C. The Parties' Arguments
Lakosh takes issue with the first two tiers of DEC's three-tiered method for determining whether technology is the best available, contending that they are inconsistent with AS 46.04.030(e).[25] He argues that the legislature intended to require a "`state of the art' quality of response equipment" that "necessarily requires a comparative analysis of available technologies"  an individualized analysis like one prescribed for third-tier technology in 18 AAC 75.445(k)(3). In Lakosh's view, a definition that categorically approves any technology capable of achieving the applicable response planning or prevention performance standards  in other words, any technology "appropriate and reliable" to meet the standards  conflicts with the statutory intent to require that only the best available technology be used. Lakosh thus protests that the tier one and two standards set out in 18 AAC 75.445(k)(1) and (2) are "static" and contain no provisions for requiring plan holders to employ state-of-the-art technologies.
But DEC responds that the best available technology statute "`leaves it to the DEC to define what is best available technology.'" In DEC's view, requiring that a technology be "appropriate and reliable" to meet the "magnitude of the applicable response planning standard" suffices to define best available technology because the standards themselves are "the most demanding... standards in the world." Indeed, DEC argues, the standards actually encourage innovation by allowing a plan holder to use "a new, different and more efficient technology to meet the [applicable] standard rather than simply imposing a `one-size-fits-all' technological fix."[26] Hence DEC urges us to recognize that, given the discretion delegated to it by the legislature, either a standards-based test like those specified in the first two tiers of the challenged regulation or an individualized analysis like the one set out in the third tier can be used to determine what is best available technology.

D. The First Two Tiers of the Definition, Set Out in 18 AAC 75.445(k)(1) and (2), Are Inconsistent with the Statutory Best Available Technology Requirement.
In addressing the parties' arguments we must first consider whether to give deference to DEC's interpretation of the best available technology statute. DEC contends that we should give deference to its judgment because "oil spill contingency planning and the application of a best technology requirement to oil spill response technologies... and oil spill prevention technologies ... implicate DEC's specialized technical expertise and experience." This argument has considerable merit, but only to the extent that the legislature actually granted DEC authority to define best available technology. DEC's selection of a specific definition from among the many potentially encompassed within the general directive requiring "best available technology" certainly involved the kind of technical expertise and experience that courts are ill-equipped to second guess. To the extent that DEC's definition of best available technology lies within the broad contours contemplated by the legislature, then, the agency's judgment deserves considerable deference.[27]
*1117 But whether DEC's definition lies within the limits of authority delegated by the legislature raises a threshold question of legislative intent. The Alaska legislature specifically required that a "contingency plan must provide for the use by the applicant of the best technology that was available at the time the contingency plan was submitted or renewed."[28] The question whether DEC properly interpreted the legislature's mandate in promulgating 18 AAC 75.445(k)(1) and (2) is answerable through "statutory interpretation or other analysis of legal relationships about which courts have specialized knowledge and experience."[29] Because this preliminary legal question resides within the traditional province of judicial review and involves no technical expertise, we decide it using our independent judgment.[30]
In contending that a basic conflict exists between the statutory best-available-technology mandate and DEC's regulation implementing that mandate, Lakosh emphasizes the statute's use of the word "best ." As commonly defined, the superlative "best" posits a universe of suitable or satisfactory candidates and denotes selection of a smaller group of those most desirable within that universe.[31] Here, Lakosh argues, DEC effectively ignored the legislature's mandate to select the most desirable technologies from among the larger universe of satisfactory technologies by defining the first two tiers of "best available technology" to include essentially all suitable and satisfactory oil spill prevention and cleanup technologies.
Under 18 AAC 75.445(k)(1), all oil spill containment and cleanup technologies that can satisfy the containment and cleanup response planning standards set out in AS 46.04.030(k)  that is, all that are "appropriate and reliable" to meet those standards  are automatically deemed "best." Correspondingly, under 18 AAC 75.445(k)(2), all oil pollution prevention technology that is not expressly made subject to individualized best available technology review is automatically deemed "best" as long as it can satisfy  that is, "comply with"  the oil pollution prevention performance standards specified in 18 AAC 75.005-.080. Both the first and second tiers of the regulation, then, seemingly defy the legislative intent implicit in the usual meaning of "best": the intent to require a selection of the most desirable technologies from among a broader universe of technologies that would be suitable and satisfactory to comply with the requirements of a contingency plan  which include a demonstrated ability to meet applicable standards.
Of course the plain meaning of "best" is not the end of the story. In construing statutory language, "we have rejected the mechanical application of the `plain meaning' rule in favor of a sliding scale approach under which `[t]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be.'"[32] But here, both the legislative history and context of the best available technology statute support its plain meaning.
In revising the original oil spill prevention and contingency plan statute, the legislature adopted detailed response planning standards governing spill containment and cleanup that contingency plans must address *1118 when submitted for approval.[33] DEC has subsequently adopted detailed oil pollution prevention performance standards that must be addressed in contingency plans.[34] The legislature also specified that, before DEC may approve a contingency plan, the agency must "ensure that the applicant for a contingency plan has access to sufficient resources to protect environmentally sensitive areas and to contain, clean up, and mitigate potential oil discharges from the facility or vessel as provided [by the response planning standards] and to ensure that the applicant complies with the contingency plan."[35] DEC has likewise provided that contingency plan applicants and holders are "responsible for meeting the applicable requirements" of the performance standards set out in its oil pollution prevention regulations.[36] And the legislature has given DEC broad authority to require plan applicants or holders to demonstrate their ability to carry out their contingency plans.[37]
These mandatory standards are thus baseline requirements that all plan holders must be prepared to meet. And because the legislature adopted mandatory cleanup and containment response planning standards at the same time that it required the use of best available technology to carry out those standards, it obviously did not intend to equate best available technology with the ability to *1119 meet response planning standards; rather, it intended best available technology to be an additional requirement.
Because they stand as separate subsections in the same statute, then, AS 46.04.030(k)'s mandatory response planning standards and AS 46.04.030(e)'s best available technology requirement evince an intent to impose two separate requirements: under subsection .030(k), all contingency plan holders must demonstrate their ability to comply with applicable standards; and under subsection.030(e), all applicants must also provide that they will achieve this compliance  which is required as part of their plans  by using "the best technology that was available at the time the contingency plan was submitted or renewed."
The first two tiers of DEC's best available technology regulation conflate these separate requirements by collapsing best available technology into compliance with requisite standards. Yet this interpretation effectively renders AS 46.04.030(e)'s best available technology requirement superfluous, for if the legislature had wanted nothing more than to require technology to provide an "appropriate and reliable" way of complying with applicable standards, it could as easily have omitted subsection .030(e)'s best available technology language entirely and let the balance of section .030 stand on its own.
We decline to read the best available technology provision in this way. It is a well-recognized rule of statutory construction that "`the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous.'"[38] Defining best available technology in terms of statutory minimums, then, cannot be consistent with the legislative intent of requiring that plan holders provide for the use of best available technology. And DEC points to no legislative history supporting a contrary interpretation.
The legislature plainly required that plan holders meet response planning standards and provide for the use of the best available technology in contingency plans. Because agencies are "not free to disregard any of the standards the legislature has articulated," DEC's regulations must reflect both statutory requirements.[39] Paragraphs (k)(1) and (k)(2) of 18 AAC 75.445 fail to reflect both requirements and are therefore deficient.
Paragraph (k)(1) allows plan holders to meet the best available technology requirement for oil spill cleanup and containment by planning to use any reasonably satisfactory technology  that is, any technology that would be "appropriate and reliable" to meet the cleanup and containment response planning standards mandated by the response planning statute, AS 46.04.030(k). But as already indicated, AS 46.04.030(e) requires an additional step: a selection of the best technology from among all that is reasonably capable of meeting the response planning standards. Hence, by equating best available technology to "appropriate and reliable" compliance with response planning standards, the definition in paragraph (k)(1) of the regulation violates AS 46.04.030(e)'s command to select the best of all available technology that is capable of complying with these standards.
The same conclusion holds true for the definition of best available technology set out in paragraph (k)(2) of the regulation, which effectively equates best available oil pollution prevention technology to technology that is reasonably capable of meeting specified oil pollution prevention performance standards.
In defense of its regulation, DEC essentially argues that the applicable standards are a legitimate proxy for best available technology  that good technology is bound to follow if standards are set sufficiently high.[40] *1120 The challenged regulation reflects this approach. But while we assume that DEC's approach may have considerable theoretical merit, it is legally incompatible with the approach that the Alaska legislature adopted in AS 46.04.030(e) and (k), for the statute requires DEC to insist on the use of best available technology in addition to demanding compliance with applicable standards. As DEC correctly notes, "[t]he [l]egislature did not choose between approaches." Yet DEC fails to recognize that the legislature chose both approaches and that this decision precludes DEC from then choosing one approach and ignoring the other.
Though we declare the challenged regulations invalid, we emphasize the limited scope of our ruling. We recognize of course that the task of defining best available technology is well outside the scope of the judiciary's responsibility and falls squarely within DEC's area of authority and expertise. We readily acknowledge that the legislature has vested DEC with broad discretion to decide how "best available technology" should be defined; and we believe that the agency is free to exercise this discretion not only in prescribing the methods for selecting the best from among all available technologies that are satisfactory, but also in deciding how broadly the class of best technologies should be drawn  that is, how many of all available satisfactory technologies should be accepted as "best." But as a matter of statutory interpretation we are nevertheless constrained to hold that DEC's definition must at least include some winnowing process  that AS 46.04.030(e) requires something more than accepting all available technology that can "appropriately and reliably" comply with oil spill prevention and cleanup standards. We agree with Lakosh that DEC's current definitions fail this threshold requirement.

IV. CONCLUSION
Because the definition of best available technology in 18 AAC 75.445(k)(1) and (2) is contrary to AS 46.04.030(e), we REVERSE the superior court's summary judgment order and REMAND for entry of judgment declaring the regulation invalid.
NOTES
[1] Ch. 116, § 1(a)(1), SLA 1980.
[2] See former AS 46.04.030. Under AS 46.04.030(a) & (k), "oil discharge prevention and contingency plan[s]" are plans to prevent, contain, and clean up oil spills from oil tank vessels, offshore oil exploration or production facilities, and large oil terminal facilities.
[3] Former AS 46.04.030(e).
[4] AS 46.04.030(k); see also ch. 191, §§ 9, 10, SLA 1990.
[5] AS 46.04.030(e).
[6] AS 46.04.030(j); see also AS 46.04.070 ("[DEC] shall adopt regulations that are necessary to carry out the purposes of this chapter and that do not conflict with and are not preempted by federal law or regulations."); ch. 191, § 10, SLA 1990.
[7] O'Callaghan v. Rue, 996 P.2d 88, 94 (Alaska 2000); Bd. of Trade, Inc. v. State, Dep't of Labor, Wage & Hour Admin., 968 P.2d 86, 89 (Alaska 1998).
[8] Lauth v. State, Dep't of Health & Soc. Servs., 12 P.3d 181, 184 (Alaska 2000); Bd. of Trade, 968 P.2d at 89.
[9] See AS 44.62. Because Lakosh does not argue that DEC violated the Administrative Procedure Act in promulgating the regulations, we need not analyze whether DEC complied with the Act's provisions.
[10] O'Callaghan, 996 P.2d at 95; Bd. of Trade, 968 P.2d at 89; State, Dep't of Revenue, Permanent Fund Dividend Div. v. Cosio, 858 P.2d 621, 624 (Alaska 1993); State v. Anderson, 749 P.2d 1342, 1344 (Alaska 1988); State v. Alyeska Pipeline Serv. Co., 723 P.2d 76, 78 (Alaska 1986).
[11] Kelly v. Zamarello, 486 P.2d 906, 911 (Alaska 1971); accord Lauth, 12 P.3d at 184; O'Callaghan, 996 P.2d at 94-95; Anderson, 749 P.2d at 1343-44; Chevron U.S.A. Inc. v. LeResche, 663 P.2d 923, 926-27, 930 n. 15 (Alaska 1983).
[12] O'Callaghan, 996 P.2d at 94.
[13] Id.
[14] Id. at 94-95. However, "reasonable necessity is not a requirement separate from consistency. If it were, courts would be required to judge whether a particular administrative regulation is desirable as a matter of policy"; this is a function of the agency. State, Bd. of Marine Pilots v. Renwick, 936 P.2d 526, 531 (Alaska 1997) (citing Cosio, 858 P.2d at 624).
[15] O'Callaghan, 996 P.2d at 95.
[16] Subsections .030(b) and (c) extend this requirement to persons operating pipelines, exploration or production facilities, tank vessels, and barges.
[17] See AS 46.04.030(k)(1)-(5). For example, a plan holder must be able to "contain or control, and clean up a discharge equal to the capacity of the largest oil storage tank at the [oil terminal] facility within 72 hours." AS 46.04.030(k)(1).
[18] AS 46.04.030(k)(1)-(5).
[19] See 18 Alaska Administrative Code (AAC) 75.005-.080 (2001) (setting forth requirements for personnel training, security measures, record-keeping, oil transfers, leak detection, monitoring, operations, storage tanks, secondary containment, and facility piping).
[20] DEC generally defined "best available technology" to mean "the best proven technology that satisfies the provisions of 18 AAC 75.425(e)(4) and 18 AAC 75.445(k)." 18 AAC 75.990(9). DEC defined "technology" to mean "equipment, supplies, other resources, and related practices." 18 AAC 75.990(130).
[21] 18 AAC 75.445(k)(1); see also 18 AAC 75.430.442 (establishing the standards and factors).
[22] See 18 AAC 75.445(k)(2).
[23] For technology included in the third tier, 18 AAC 75.445(k)(3) requires DEC to determine compliance with the best available technology requirement by considering

(A) whether each technology is the best in use in other similar situations and is available for use by the applicant;
(B) whether each technology is transferable to the applicant's operations;
(C) whether there is a reasonable expectation each technology will provide increased spill prevention or other environmental benefits;
(D) the cost to the applicant of achieving best available technology, including consideration of that cost relative to the remaining years of service of the technology in use by the applicant;
(E) the age and condition of the technology in use by the applicant;
(F) whether each technology is compatible with existing operations and technologies in use by the applicant;
(G) the practical feasibility of each technology in terms of engineering and other operational aspects; and
(H) whether other environmental impacts of each technology, such as air, land, water pollution, and energy requirements, offset any anticipated environmental benefits.
[24] See 18 AAC 75.425(e)(4) (listing the residual classes).
[25] Lakosh does not dispute the criteria for evaluating third-tier technology under 18 AAC 75.445(k)(3).
[26] DEC further points to 18 AAC 75.447, which requires DEC to identify and evaluate "breakthrough" technologies by sponsoring a technology conference at least once every five years and to "engag[e] in studies, inquiries, surveys, or analyses [that DEC] believes appropriate to the consideration of new technologies." DEC argues that its reliance on a technology's appropriateness and reliability to comply with performance standards will be rendered more meaningful as a test of best available technology because DEC will have this "breakthrough technology" information at hand when evaluating whether prevention and contingency plans use best available technology.
[27] See State, Bd. of Marine Pilots v. Renwick, 936 P.2d 526, 531 (Alaska 1997) (quoting Whaley v. State, 438 P.2d 718, 722 (Alaska 1968)) ("[T]he well settled rule [ ] requires courts to give consideration and respect to the contemporaneous construction of a statute by those charged with its administration, and not to overrule such construction except for weighty reasons.") (alterations in original).
[28] AS 46.04.030(e).
[29] Kelly v. Zamarello, 486 P.2d 906, 916 (Alaska 1971); see also Lauth v. State, Dep't of Health & Soc. Servs., 12 P.3d 181, 184 (Alaska 2000); Bd. of Trade, Inc. v. State, Dep't of Labor, Wage & Hour Admin., 968 P.2d 86, 89 (Alaska 1998) (stating that the court will not replace the agency's judgment with its judgment, but will review for reasonableness, arbitrariness, and consistency); State, Commercial Fisheries Entry Comm'n v. Templeton, 598 P.2d 77, 80-81 (Alaska 1979).
[30] See sources cited supra note 29.
[31] According to Webster's, for example, "best" means "1. Exceeding all others in excellence, achievement, or quality: most excellent ... 2. Most satisfactory, suitable, or useful: most desirable...." WEBSTER'S II NEW COLLEGE DICTIONARY 105 (1999).
[32] Bd. of Trade, 968 P.2d at 91 (quoting Muller v. BP Exploration (Alaska), Inc., 923 P.2d 783, 787-88 (Alaska 1996)).
[33] AS 46.04.030(k) provides:

Except as provided in (m) and (o) of this section, the holder of an approved contingency plan required under this section shall maintain, or have available under contract, in its region of operation or in another region of operation approved by [DEC], singly or in conjunction with other operators, sufficient oil discharge containment, storage, transfer, and cleanup equipment, personnel, and resources to meet the following response planning standards:
(1) for a discharge from an oil terminal facility, the plan holder shall plan to be able to contain or control, and clean up a discharge equal to the capacity of the largest oil storage tank at the facility within 72 hours, except that if [DEC] determines that the facility is located in an area of high risk because of natural or man-made conditions outside of the facility, it may increase the volume requirement under this paragraph so that the contingency plan must be designed for a response that is greater in amount than the capacity of the largest oil storage tank at the facility;
(2) for a discharge from an exploration or production facility or a pipeline, the plan holder shall plan to be able to contain or control, and clean up the realistic maximum oil discharge within 72 hours;
(3) for a discharge of crude oil from a tank vessel or oil barge, the plan holder shall plan to be able to contain or control, and clean up a realistic maximum oil discharge as provided in (A), (B), and (C) of this paragraph:
(A) for tank vessels and oil barges having a cargo volume of less than 500,000 barrels, the plan holder shall maintain at a minimum in the region of operation, equipment, personnel, and other resources sufficient to contain or control, and clean up a 50,000 barrel discharge within 72 hours;
(B) for tank vessels and oil barges having a cargo volume of 500,000 barrels or more, the plan holder shall maintain at a minimum in its region of operation, equipment, personnel, and other resources sufficient to contain or control, and clean up a 300,000 barrel discharge within 72 hours;
(C) in addition to the minimum equipment, personnel, and other resources required to be maintained within the region of operation by (A) or (B) of this paragraph, a plan holder shall maintain, either within or outside of the plan holder's region of operation, additional equipment, personnel, and other resources sufficient to contain or control, and clean up a realistic maximum discharge within the shortest possible time; the plan holder must demonstrate that the equipment, personnel, and other resources maintained outside the plan holder's region of operation are accessible to the plan holder and will be deployed and operating at the discharge site within 72 hours;
(4) for a discharge from a tank vessel or oil barge carrying noncrude oil in bulk as cargo, the plan holder shall plan to be able to contain or control 15 percent of the maximum capacity of the vessel or barge or the realistic maximum oil discharge, whichever is greater, within 48 hours and clean up the discharge within the shortest possible time consistent with minimizing damage to the environment;
(5) for a discharge subject to the provisions of (1)-(3) of this subsection that enters a receiving environment other than open water, the time requirement for clean up of the portion of the discharge that enters the receiving environment may, in [DEC's] discretion, be within the shortest possible time consistent with minimizing damage to the environment.
DEC has retained and elaborated these standards in 18 AAC 75.430-.442.
[34] See 18 AAC 75.005-.080.
[35] AS 46.04.030(e).
[36] 18 AAC 75.005.
[37] See AS 46.04.030(e)(1)-(3).
[38] Kodiak Island Borough v. Exxon Corp., 991 P.2d 757, 761 (Alaska 1999) (quoting Rydwell v. Anchorage Sch. Dist., 864 P.2d 526, 530-31 (Alaska 1993)).
[39] Kalmakoff v. State, Commercial Fisheries Entry Comm'n, 693 P.2d 844, 853 (Alaska 1985).
[40] For commentary discussing whether standards like those established in paragraphs (k)(1) and (k)(2) of 18 AAC 75.445 are superior to traditional best available technology standards, compare Bruce A. Ackerman & Richard B. Stewart, Reforming Environmental Law, 37 STAN. L.REV. 1333, 1354 (1985) (arguing for a change from technology-based standards to pollution-based performance standards) with Howard Latin, Ideal Versus Real Regulatory Efficiency: Implementation of Uniform Standards and Fine Tuning Regulatory Reforms, 37 STAN. L.REV. 1267, 1267, 1273 (1985) (arguing that fine-tuning approaches like performance and response planning standards have not been proven effective).