Tom CHALOVICH, Appellant,

v.

STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES, Tom Irwin, Commissioner, and Harold F. Parker, Appellees.

No. S–10977.

Supreme Court of Alaska.

Dec. 30, 2004.

J.P. Tangen, Anchorage, for Appellant.

Lawrence Z. Ostrovsky, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee State of Alaska.

Harold F. Parker, pro se, Anchorage.

Before: BRYNER, Chief Justice, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

Tom Chalovich appeals a final decision by the Department of Natural Resources (DNR) finding that he abandoned his state mining claims by failing to timely make a payment in lieu of annual labor as required by 11 Alaska Administrative Code (AAC) 86.220(h). Chalovich attacks the validity of this regulation on the grounds that it is inconsistent with the Alaska Land Act,[1] arbitrary, and unconstitu-

---

1. AS 38.05.

tional. He also claims that 11 AAC 86.107(g), which prevents DNR from refunding cash payments made in lieu of annual labor, has resulted in an unconstitutional taking because the department has not refunded payments made since his claims were deemed abandoned. Because we find that Chalovich timely paid cash in lieu of annual labor by placing payment in the mail by the regulatory deadline, we reverse the determination that he abandoned his claims.

## II. FACTS AND PROCEEDINGS

■ Tom Chalovich purchased five mining claims in November 1997 from Carol Brown. Two of these claims, Akland 2–3, were staked over claims previously held by Dennis Brown, Carol's husband, and his mining partner, Harold Parker, that were deemed abandoned by DNR. Another claim, Akland 8, covered a previous claim staked by Dennis Brown and Parker and never abandoned. Because Parker asserted a competing interest in Akland 2 and 8, Chalovich filed suit to quiet title in August 1998. Through decisions by the superior court in October 1999 and July 2002, Chalovich successfully quieted title in Akland Nos. 2–5, though his complaint regarding Akland No. 8 was dismissed without prejudice on Chalovich's motion pending his appeal of DNR's determination that he did not perform annual labor[2] for this claim in 2000. The department had initially determined that Chalovich abandoned[3] all five claims because he made the 2000 cash-in-lieu-of-labor payment on November 29, 2000, nearly three months after

the September 1 deadline, but the department later determined that a survey conducted on Akland claims Nos. 2–5 would qualify as annual labor for those claims.

While the quiet title litigation was pending in the superior court, Parker went to the DNR offices in January 2002 to review Chalovich's annual labor affidavits for the contested claims, and he discovered that the 1999 cash-in-lieu payment for these claims was also received by DNR after the September 1 deadline. The payment was postmarked on that date, but it was not received by DNR until September 3. Parker related this information to DNR Mineral Property Manager Kerwin Krause, who informed Chalovich in January 2002 that his claims were deemed abandoned by operation of law as of September 1, 1999 pursuant to 11 AAC 86.145(a)(2) and (4), because his payment was received after the regulatory deadline.[4] Though DNR does not usually allow administrative appeals of events that occur by operation of law, such as abandonment of mining claims under AS 38.05.265,[5] Krause permitted Chalovich to appeal his decision to the commissioner. Both Chalovich and Parker appealed Krause's decision.

While Chalovich claimed that DNR should treat his payment as timely, he also argued that 11 AAC 86.220(h) was arbitrary and inconsistent with other regulatory deadlines, that forfeiture was an unreasonably harsh penalty for late payment, and that DNR would be unjustly enriched if it did not refund payments he made after his claims were forfeited on September 1, 1999. He request-

**2.** Alaska law requires miners to perform $100 worth of annual labor on or for the benefit of each mining claim. AS 38.05.210(a). Instead of performing this labor, a miner may make a $100 cash payment to the state. *Id.*

**3.** For purposes of state mining claims, the terms "abandon" and "forfeit" are synonymous. *See AU Int'l, Inc. v. State, Dep't of Natural Res.,* 971 P.2d 1034, 1038–39 (Alaska 1999) (failure to comply with filing requirements constitutes abandonment regardless of miner's subjective intent). *See also* 43 C.F.R. § 3833.0–5(z) (2003) (terms synonymous under federal mining law).

**4.** This regulation states in relevant part that "[a] cash payment made instead of performing annual labor must be received by the department …

on or before September 1st of each year.... If cash payment ... is not paid by the end of the labor year, the mining claim or leasehold location will be considered abandoned under AS 38.05.265."

**5.** This statute deems mining claims abandoned if a miner fails to "properly record a certificate of location or a statement of annual labor, pay any required annual rental, or pay any required production royalty...." Because DNR received Chalovich's payment-in-lieu of annual labor after the regulatory deadline it deemed his claims abandoned by operation of law.

We note that, after the oral argument in this case, the legislature amended this statute to allow a defaulting miner to cure his abandonment. Ch. 26, SLA 2004.

ed a hearing on his appeal. Parker objected that Chalovich had no right to appeal Krause's decision because his claims were forfeited by operation of law. Commissioner Pat Pourchot issued a final decision in July 2002 denying both appeals. Pourchot upheld the department's decision because it was made pursuant to a validly adopted regulation, and he rejected Chalovich's request for a hearing because there were no disputed questions of fact. He did not address Chalovich's claim that the department had no right to retain the annual labor payments made since September 1, 1999. While Pourchot agreed with Parker that the department's January 2002 decision should not have been appealable, he noted that no harm resulted since he was denying Chalovich's appeal.

Chalovich appealed the commissioner's decision to the superior court in August 2002, and Parker filed a motion to dismiss the appeal on the grounds that DNR should have rejected Chalovich's appeal since forfeiture occurs as a matter of law. The superior court granted Parker's motion in January 2003, holding that because Chalovich failed to comply with the provisions of AS 38.05.265, his claims were forfeited by operation of law and he had no right to an administrative appeal. The superior court denied Chalovich's motion for reconsideration in February 2003. Chalovich appeals.

### III. STANDARD OF REVIEW

■ When the superior court acts as an intermediate court of appeal, we independently review the underlying administrative decision.[6] This case presents no disputed questions of fact since the parties agree that Chalovich mailed payment to DNR on September 1 and that it was received on September 3. We review questions of law, including the interpretation of statutes and regulations, using our independent judgment.[7] When an agency has adopted regulations under a delegation of authority from the legislature using the process prescribed by the Administrative Procedures Act, we presume that the regulations are valid and place the burden of proving otherwise on the challenging party.[8] We limit our inquiry to whether the regulation is consistent with and reasonably necessary to carry out the purposes of the statutory provisions, and whether the regulation is reasonable and not arbitrary.[9]

■ In making the consistency determination, we apply our independent judgment unless the issue involves agency expertise or the determination of fundamental policy questions on subjects committed to an agency's discretion, in which case we employ a rational basis standard and defer to an agency's determination so long as it is reasonable.[10] "Whether the regulation is necessary to implement the statute involves fundamental policy determinations which we review on a rational basis standard."[11] We also use a deferential standard to conduct the "reasonable and not arbitrary review."[12]

### IV. DISCUSSION

#### A. 11 AAC 86.220(h) Validly Requires Payment in Lieu of Annual Labor by September 1, but a Postmark Is Evidence of Timely Payment.

DNR found that Chalovich abandoned his claims because it received his 1999 payment

---

6. *Crivello v. Commercial Fisheries Entry Comm'n,* 59 P.3d 741, 744 (Alaska 2002).

7. *Therchik v. Grant Aviation, Inc.,* 74 P.3d 191, 193 (Alaska 2003).

8. *Lakosh v. Alaska Dep't of Envtl. Conservation,* 49 P.3d 1111, 1114 (Alaska 2002).

9. *Id.* (citing *Kelly v. Zamarello,* 486 P.2d 906, 911 (Alaska 1971)).

10. *Id.*

11. *O'Callaghan v. Rue,* 996 P.2d 88, 94–95 (Alaska 2000). Under the rational basis standard of review, we will defer to an agency's determina-

tion so long as it is reasonable and not arbitrary. *Mech. Contractors of Alaska, Inc. v. State, Dep't of Pub. Safety,* 91 P.3d 240, 244 (Alaska 2004). "However, 'reasonable necessity is not a requirement separate from consistency. If it were, courts would be required to judge whether a particular administrative regulation is desirable as a matter of policy'; this is a function of the agency." *Lakosh,* 49 P.3d at 1114 n. 14 (quoting *State, Bd. of Marine Pilots v. Renwick,* 936 P.2d 526, 531 (Alaska 1997)).

12. *O'Callaghan,* 996 P.2d at 95.

two days after the regulatory deadline of September 1, 1999. Chalovich acknowledges that his payment was not received by DNR by September 1, but he claims that the deadline is arbitrary and that the penalty of forfeiture is unduly harsh and unconstitutional.[13] Because Chalovich has not challenged the procedure by which this regulation was adopted, our inquiry is limited to whether the regulation is consistent with and reasonably necessary to carry out the purposes of the statutory provisions, and whether the regulation is reasonable and not arbitrary.[14]

Chalovich challenges the validity of three separate aspects of 11 AAC 86.220(h): he challenges the date for payment of cash-in-lieu of labor as being inconsistent with AS 38.05.210(a); he claims that the penalty for late payment is excessive; and he argues that the requirement that payment be received, rather than postmarked, by the deadline is arbitrary. While we uphold the challenged regulation to the extent that it requires performance of labor by September 1, we agree with Chalovich that it is unreasonable to require actual receipt of payment rather than treating a postmark as the date of payment.

### 1. Annual labor is required to maintain a state mining claim.

As noted, in order to maintain a state mining claim, each claim holder must perform annual labor valued at $100 on or for the benefit of each claim or make a cash-in-lieu payment instead of performing labor.[15] By statute, DNR has authority to "establish the date of the commencement of the year during which the labor or improvements are to be performed."[16] The department determined that the labor year begins on September 1 and it requires performance of all required labor by that date.[17] Cash payments in lieu of labor must be received by that date.[18] Within ninety days after the end of the labor year each claim holder must file an affidavit[19] with the department describing, among other things, the dates and character of labor performed or improvements made, and the amount of any cash payment made in lieu of annual labor.[20] An affidavit that does not include this required information is considered void and the mining claim is deemed abandoned.[21] The contested regulation, 11 AAC 86.220(h), states that a claim is forfeited if payment is not *received* by September 1. Because DNR did not receive Chalovich's 1999 payment until September 3, 1999, it determined that he had abandoned his claims under the terms of 11 AAC 86.220(h).

Abandonment of mining claims is governed by AS 38.05.265, which states that the

> [f]ailure to properly record ... a statement of annual labor ... constitutes abandonment of all rights acquired under the mining claim, leasehold location, or prospecting site involved.... A statement of annual labor that does not accurately set out the essential facts is void and of no effect.

Chalovich claims that he did not violate AS 38.05.265 because he properly recorded a statement of annual labor within ninety days of the end of the labor year, and he cites as proof the fact that DNR received his payment-in-lieu and affidavit of annual labor on September 3, 1999. Chalovich separates the requirement to perform labor from the requirement to submit an affidavit describing such labor, and he reads AS 38.05.265 narrowly to impose forfeiture only for failure to record the affidavit by November 30—not for

---

**13.** Because we resolve this case in Chalovich's favor on nonconstitutional grounds, it is unnecessary for us to reach his constitutional argument.

**14.** *Lakosh,* 49 P.3d at 1114.

**15.** AS 38.05.210(a).

**16.** *Id.*

**17.** 11 AAC 86.220(a).

**18.** 11 AAC 86.220(h).

**19.** Although the statutes require a "statement" of annual labor, DNR regulations require that the statement be in the form of an affidavit. *See* AS 38.05.210(b); 11 AAC 86.220(c). The terms are synonymous.

**20.** AS 38.05.210(b); 11 AAC 86.220(c).

**21.** AS 38.05.265; 11 AAC 86.220(g).

failure to perform the labor the affidavit must describe. He also claims that payment of cash in lieu of labor should be timely if received by November 30, the deadline for receipt of affidavits of labor, rather than the September 1 deadline for performance of labor. In short, Chalovich argues that those paying cash rather than performing labor should receive an additional three months for performance, and that, in any event, forfeiture is an inappropriate penalty for mere tardiness.

The department responds that labor must be performed by September 1 because a statement of annual labor cannot be properly recorded if the required labor is not performed by that date. Alaska Statute 38.05.265 would be meaningless, it argues, if a miner did not complete annual labor but could nonetheless avoid forfeiture by filing an affidavit by November 30 stating that no labor was performed or payment made, or that performance was late. Because AS 38.05.210(a) requires annual labor, and because AS 38.05.265 deems claims abandoned if a statement of labor is not recorded, the department argues that 11 AAC 86.220(h) fills a statutory gap by requiring payment of the labor substitute by the end of the mining year. We agree with DNR that all labor must be performed by September 1 and that forfeiture is an appropriate penalty for late performance. We disagree only on the department's standard for timely performance of labor.

### a. Annual labor must be performed by September 1.

■ DNR has authority to define the labor year for mining claims. Alaska Statute 38.05.210(a) grants authority to DNR to "establish the date of the commencement of the year during which labor or improvements are to be performed" and, through regulations, DNR established that the labor year runs from noon on September 1 through noon the following September 1.[22] The mining year is the same regardless of whether a miner performs labor or makes a cash payment. Federal mining law defines the mining year using the same dates.[23] There is no question that DNR acted within its delegated authority to establish a deadline for annual labor, and the fact that federal and state mining law define the mining year using the same dates demonstrates that the state's choice of September 1 is reasonable and not arbitrary. Even Chalovich concedes that "DNR is well within its rights to set a September 1 deadline for the receipt of cash-in-lieu payments." His concern is not with the deadline for labor but with the definition of timeliness and the penalty for late performance.

### b. A mining claim is abandoned if labor is not performed by September 1.

■ Alaska Statute 38.05.210 requires both that miners perform $100 of annual labor and that they file a signed statement confirming that they performed the required labor "[d]uring the year in which annual labor is required or within 90 days after the close of that year."[24] The requirement to file an affidavit of annual labor has been a feature of Alaska mining law since 1961[25] and of federal mining law applicable to federal lands in Alaska since 1907.[26] Chalovich claims that, even if he is required to submit an affidavit of annual labor, nothing in the statute clearly states that the labor must be completed before the affidavit can be submitted. According to this argument, because AS 38.05.265 does not state that claims are abandoned if labor is not performed, but rather that a "[f]ailure to properly record . . . a statement of annual labor . . . constitutes abandonment," Chalovich's claims would only be forfeited if he failed to record a statement of annual labor by the November 30 deadline—irrespective of whether he even performed annual labor or paid cash-in-lieu. According to Chalovich, since abandonment technically follows from the failure to proper-

---

**22.** 11 AAC 86.220(a).

**23.** 30 U.S.C. § 28(f) (1993); 43 C.F.R. § 3833.1–5 (2003).

**24.** AS 38.05.210(a), (b).

**25.** Ch. 123, § 5, SLA 1961.

**26.** Ch. 2559, § 1, 34 Stat. 1243 (1907), currently codified at 30 U.S.C.A. § 49e (2004).

ly document the performance of annual labor, and not from the failure to actually perform the required labor, "DNR just made this rule up out of whole cloth. It is the very definition of an arbitrary mandate and is no more appropriate than a requirement that the claim owner hop on his left foot by September 1." This argument misses the point—and it undermines the intent of AS 38.05.210(a)—that all miners must perform annual labor.

While AS 38.05.265 does not state that claims are abandoned if labor is not performed by September 1, a regulation to that effect implements the intent of that statute, particularly since "[a] statement of annual labor that does not accurately set out the essential facts is void and of no effect."[27] Since the labor performed or cash paid are essential facts,[28] a claim holder cannot properly set out these facts if they are not actually performed. The challenged regulation implements AS 38.05.210 by requiring payment by the end of the labor year as a necessary precondition to filing a statement of annual labor, and the penalty for non-compliance is consistent with AS 38.05.265. If a claim holder fails to properly record a statement of annual labor he forfeits his claims.

Chalovich also argues that forfeiture is inappropriate because the dual deadlines— September 1 for performance of labor and November 30 for filing a statement of labor—create an "unfair trap for the unwary." According to Chalovich, the use of two deadlines is confusing, particularly since DNR requires that payment-in-lieu be accompanied by "a copy of the affidavit of annual labor or a statement containing the name and [Alaska Division of Land] number for the mining claim."[29] He claims that the implication of this regulation is that cash-in-lieu need not be paid until November 30, when the affidavit of annual labor is due. But DNR's regulations are clear and unambiguous: Labor must be performed by September

ber 1. If a miner performs actual labor, it must be completed by September 1 but he need not submit an affidavit affirming its completion until November 30. If a miner opts to make a cash payment, such payment must be received by September 1, and it must be accompanied by documentation sufficient to identify the claims for which payment is made—either the statement of annual labor or the name and ADL number of the claim. The affidavit need not be submitted by September 1 so long as payment is accompanied by the name and ADL number for the relevant claim. Additionally, the deadline for payment-in-lieu is clearly noted on the form affidavit of annual labor provided by DNR. As the commissioner explained in his written decision, while a claim holder does have to keep track of two different deadlines, the overall number of claims abandoned for late payment is small, with none recorded in 2001. Since 1961 Alaska's miners have had ninety days from the end of the labor year to submit an affidavit of annual labor,[30] and this requirement is statutory, not regulatory.[31] The dual deadlines are not a trap for the unwary.

■ The core of Chalovich's argument is that forfeiture is an "abhorrent" penalty for what he characterizes as petty, procedural non-compliance. We addressed forfeiture of mining claims in *AU International, Inc. v. State, Department of Natural Resources*,[32] and agreed with DNR that the failure to record a statement of annual labor that includes all essential facts constitutes abandonment without regard to intent.[33] In *AU International,* the claim holder actually performed the required labor to improve its 1,035 claims, but the statement of labor it filed with DNR listed the name or claim number for only four claims.[34] We held that the remaining 1,031 claims were abandoned by operation of law because the statement of labor did not include the "essential facts" for

27. AS 38.05.265.

28. 11 AAC 86.220(c).

29. 11 AAC 86.220(h).

30. Ch. 123, § 5, SLA 1961.

31. AS 38.05.210(b).

32. 971 P.2d 1034 (Alaska 1999).

33. *Id.* at 1038.

34. *Id.* at 1036.

these claims.[35] By regulation, these essential facts include the name or number of the mining claim, and the dates of performance of labor and the character of the labor performed, or the amount of cash paid in lieu of annual labor.[36] If a claim is abandoned for failure to properly record its name or number—even though labor was performed—then clearly a claim is abandoned if the required labor is not actually performed within the labor year. *Kile v. Belisle*,[37] cited by Chalovich in support of his argument that abandonment requires intent, is not to the contrary. In *Kile*, we noted that under federal law the failure to perform annual labor does not by itself constitute abandonment,[38] but the question in that case was whether federal mining claims had been abandoned.[39] As we explained in *AU International*, Alaska mining law, unlike federal law, requires no proof that a miner intended to abandon his claim, and a state mining claim will be deemed abandoned for failure to comply with the requirements of AS 38.05.265 irrespective of the claim holder's intent.[40]

Moreover, federal mining regulations have generally been interpreted to require strict compliance with deadlines and filing requirements.[41] Indeed, when the federal government began requiring miners to submit affidavits of annual labor in 1976, the Bureau of Land Management (BLM) routinely found that miners had abandoned their claims if the affidavits were received after the filing deadline—even if they were postmarked well in advance.[42] While federal law now requires most miners to pay a cash "maintenance fee" rather than perform annual labor, the failure

to timely pay this fee still results in forfeiture.[43]

Chalovich may characterize the Alaska Land Act's procedural requirements as petty, but it is the system created by the legislature, and it is consistent with federal law. Chalovich nonetheless argues that forfeiture violates article VIII, section 1 of the Alaska Constitution, which states that "[i]t is the policy of the State to encourage the settlement of its land and the development of its resources by making them available for maximum use consistent with the public interest." But article VIII, section 11 further states that "[c]ontinuation of [mineral] rights shall depend upon the performance of annual labor, or the payment of fees, rents, or royalties, or upon other requirements as may be prescribed by law." Regulations requiring payment of cash in lieu of labor by September 1 and deeming claims abandoned if payment is not received by that date are consistent with the statutes they implement, are reasonable and not arbitrary, and are consistent with the Alaska Constitution.

Fundamentally, Chalovich seeks preferential treatment for those who pay cash rather than perform annual labor. Allowing miners to pay cash-in-lieu until November 30 would create a fifteen month "year" for some miners and a twelve month year for others. There is no justification for allowing such disparate treatment. The legislature requires that claim holders perform annual labor to maintain their state mining claims. By regulation, this labor must be performed between September 1 and the subsequent September 1. If labor is not performed by

35. *Id.* at 1038.

36. 11 AAC 86.220(c).

37. 759 P.2d 1292 (Alaska 1988).

38. *Id.* at 1296 n. 13.

39. *AU Int'l, Inc.*, 971 P.2d at 1038.

40. *Id.* at 1038–39.

41. *See United States v. Locke*, 471 U.S. 84, 101, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985) ("Filing deadlines, like statutes of limitations, necessarily operate harshly and arbitrarily with respect to individuals who fall just on the other side of

them, but if the concept of a filing deadline is to have any content, the deadline must be enforced.... A filing deadline cannot be complied with, substantially or otherwise, by filing late—even by one day.").

42. *See* 2 Am. L. of Mining § 45.03[2][c], § 45.05[2][a][iv] (2d ed. 1984) (noting that BLM regularly rejected submissions that were timely postmarked but received after deadline). *See, e.g., Don A. Chris Coyne*, 52 IBLA 1 (1981) (mining claim forfeited even though affidavit postmarked in advance of filing deadline and record showed that delivery delayed due to error of postal service).

43. 2 Am. L. Mining § 45.03[2][d].

September 1 a claim holder cannot properly record a statement of annual labor because he cannot accurately set out an essential fact—that he performed annual labor as required to maintain his claim. Accordingly, a claim is abandoned if labor is not performed by September 1.

### 2. A payment-in-lieu of annual labor is timely if postmarked by September 1.

 Our agreement with DNR that miners must perform annual labor by September 1 or face forfeiture of their claims does not resolve the issue before us, however, because Chalovich also argues that 11 AAC 86.220(h) unreasonably and arbitrarily requires actual receipt of payment by the September 1 deadline rather than accepting a postmark as the date of payment. DNR acknowledges that it received payment from Chalovich on September 3, 1999 in an envelope postmarked on September 1. Chalovich claims that his payment was timely because it was mailed by the deadline, and he argues that a rigid requirement of receipt unfairly makes miners dependent upon the efficiency of the postal service. While the department did not address this issue in its briefing, the commissioner stated in his July 1, 2002 final decision that the requirement of actual receipt was enacted to treat cash payment the same as actual labor.

Whether it is reasonable and not arbitrary for DNR to require actual receipt of payment in lieu of annual labor is a close question, but we must resolve it in favor of Chalovich. We reach this conclusion, despite the deferential standard of review applicable to this regulation, for two reasons. First, a requirement of actual receipt is not necessary to achieve DNR's goal of equal treatment of all claim holders. Second, the state's deadlines are no longer consistent with federal mining law, which has adopted a modified postmark rule, and while we do not require consistency between state and federal mining law, it is persuasive that BLM does not impose such a rigid requirement. We address each reason in turn.

DNR argues that it is necessary to require actual receipt of cash payments by September 1 to ensure that all miners are treated equally. We agree that since the $100 cash payment per claim is a substitute for the actual performance of labor, miners should face the same deadlines regardless of how they fulfill the labor obligation. But we cannot agree that the contested regulation is an appropriate way to achieve this goal. In fact, for reasons that we explain below, the regulation actually undermines DNR's goal of equal treatment. Further, by requiring actual receipt of payment by September 1, the department unnecessarily exposes miners to risk of forfeiture due solely to the vagaries of the postal service.[44]

This regulation is starkly different from the one proposed by DNR in 1989 when it revised the mining regulations in response to the legislature's amendment of AS 38.05.210 to allow payment in lieu of labor. As originally proposed, the regulation treated as timely cash payments made within ninety days after the end of the labor year.[45] After a citizen commented that the regulation effectively provided some miners with an additional ninety days to complete annual labor, DNR adopted the current regulation which requires receipt of payment on September 1.[46] The record shows that the department appropriately considered the public comment and made changes to its proposed regulations in an effort to ensure that all miners had the same amount of time to complete their annual labor requirements.

Unfortunately, in attempting to resolve one potential inequity, DNR created another. There is no apparent reason to impose forfeiture on a miner who mails a payment of cash in lieu of labor on September 1 so long as the date of mailing can be verified through a postmark. Such a miner would receive no advantage over one who actually performs labor, nor would acceptance of a postmark as

---

44. Since abandonment occurs by operation of law, the actual date of mailing is irrelevant under the regulation and a miner's claim is forfeited even if late receipt was clearly caused by an unreasonable delay by the postal service.

45. See Agency Record for 11 AAC 86.220(h).

46. Id.

evidence of performance create an unreasonable delay in notifying DNR that labor was performed. This is particularly true since miners who physically perform labor need not inform the state of such performance until November 30.[47] If anything, the department's requirement of physical receipt means that a miner making a cash-in-lieu payment must make the payment well in advance of the deadline in case delivery of his payment is delayed by the postal service. The likelihood of such an occurrence is nonnegligible since most miners are likely to mail payments or affidavits to DNR rather than deliver them in person.[48] If cash-in-lieu is a substitute for annual labor, miners who pay it should have the same time to perform as miners who actually perform annual labor. Accordingly, we hold that a miner who mails payment on or before September 1, and who can verify the date of such mailing through a postmark, has performed annual labor by the end of the mining year.

We find further support for our decision today in the law applicable to federal mining claims. While Alaska is not required to adopt the same regulations as the federal government, it is persuasive that BLM has adopted a modified postmark rule precisely to avoid unwarranted forfeiture of mining claims due to delays by the postal service. In 1982 the BLM amended its regulations to treat as timely annual filings that were postmarked by the deadline so long as they were received by DNR within twenty days of the (then) December 30 filing deadline.[49] This amendment did not completely change the receipt rule to a postmark rule, because filings received after the twenty-day period were still rejected even if postmarked by December 30.[50] These regulations were subsequently amended to provide a fifteen-day grace period[51] and to govern payment of annual maintenance fees,[52] which are due by September 1.[53]

The legislative history of the 1982 amendments shows that BLM made the changes to "save a large number of mining claimants from the loss of their claims due to delays in the mails over the holiday season."[54] BLM noted that strict application of the existing regulation had led to the loss of claims due solely to "the heavy volume of holiday mail and unusual delays in delivery times," with "annual proofs of labor ... postmarked two or three weeks prior to the statutory December 30th deadlines [being] delivered to the proper BLM office in January, which is after the filing deadline."[55] But BLM was not worried solely about holiday-related mail delays because federal regulations now provide for a fifteen-day grace period for payment of the annual maintenance fee, which is due on or before September 1.

Thus when DNR amended its regulations in 1990 to permit payment in lieu of annual labor and to require actual receipt of payment by the September 1 deadline,[56] federal regulations permitted a twenty-day "grace period" during which an affidavit of labor postmarked by the due date of December 30 could be received by BLM and still be treated as timely filed.[57] While consistency between state and federal mining law is not required, we find it persuasive that the federal government has recognized the injustice

47. 11 AAC 86.220(c).

48. Prior to June 1, 2002 the only offices for in-person payment were in Anchorage and Fairbanks. 11 AAC 86.107(c). Payments can now be made at recording district offices. *Id.* It is likely that the remote location of many miners requires that payments be mailed.

49. 2 AM. L. OF MINING § 45.05[2][a][iv].

50. *Id. See also* 47 Fed.Reg. 56305 (Dec. 15, 1982). The regulations now reflect a fifteen day "grace period" during which filings will be treated as timely so long as they are postmarked by the filing deadline. 43 C.F.R. § 3833.0–5(m) (2003).

51. 43 C.F.R. § 3830.0–5(m) (2003).

52. 43 C.F.R. § 3833.1–5 (2003); 2 AM. L. OF MINING § 45.03[2][d].

53. 43 C.F.R. § 3833.1–5(b) (2003).

54. 47 Fed.Reg. 56300 (Dec. 15, 1982).

55. 47 Fed.Reg. 56302 (Dec. 15, 1982).

56. 11 AAC 86.220 (amended 5/18/90).

57. *See* 2 AM. L. OF MINING § 44.04[12].

of allowing a miner's claims to be forfeited due solely to problems with mail delivery.

Because requiring receipt of payment-in-lieu violates DNR's stated goal of equal treatment, because DNR's regulations impose inconsistent and possibly confusing standards for timeliness, and because the federal government has adopted a less rigid standard, we find that the challenged regulation unreasonably fails to treat as timely a payment postmarked by the regulatory deadline of September 1.

### B. Chalovich's Challenge to AS 11 AAC 86.107(g) Is Moot.

Chalovich also challenges the validity of 11 AAC 86.107(g), which prohibits DNR from making a refund of a payment of cash in lieu of annual labor, and argues that the department had no right to payment after his claims were abandoned. He asserts that if he had no interest in these claims after September 1, 1999 then DNR had no right to retain the payment it received on September 3 or other payments made since that time. He concedes that he has not requested a refund, but claims that the plain language of the regulation would make it fruitless to do so. He asks that we find that the regulation was not authorized by the Alaska Land Act, and that it violates the due process clauses of the Alaska and of the United States Constitutions, as well as the principles of equity.

We decline to reach this issue in light of our decision that Chalovich timely paid cash in lieu of labor in 1999. In any event, DNR agrees that annual labor is required only for active mining claims, so any payment made after a claim is abandoned is unnecessary and would be returned to the miner.[58]

### C. Parker's Claims Are Not Properly Before this Court.

■ Appellee Parker supports DNR's position and encourages this court to find that Chalovich abandoned his mining claims on September 1, 1999. He also raises several additional arguments, one of which we previously resolved, and the remainder of which are waived since Parker did not file a cross-appeal.

Parker asks that we strike from the record two superior court decisions that pertain to his dispute with Chalovich over ownership of the Akland claims, because he alleges that these documents were not part of the department's record on appeal. These decisions are in the agency record. While they provide relevant background information about the status of these claims, they are immaterial to the resolution of the legal questions raised in this case. In any event, we previously denied Parker's motion to strike these documents, and there is no reason to address this issue a second time.

Parker also claims that his constitutional rights were violated because the superior court denied his requests for attorney's fees and for monetary sanctions against Chalovich. Because Parker, the appellee in this case, did not file a cross-appeal, these claims are not properly before us and will not be considered.[59]

## V. CONCLUSION

DNR determined that Tom Chalovich abandoned his state mining claims pursuant to AS 38.05.265 because he did not perform annual labor as required by AS 38.05.210(a). Because Chalovich timely paid cash-in-lieu by the September 1 deadline, we REVERSE the agency's decision that he abandoned his claims. Accordingly, we need not address the validity of 11 AAC 86.107(g). Because Harold Parker did not file a cross-appeal his claims are not properly before the court.

MATTHEWS, Justice, not participating.

---

58. Although the superior court's decision also found that Chalovich was not entitled to an administrative appeal, we need not consider that point because neither Parker nor DNR raises it in their briefing.

59. See *McQueary v. McQueary*, 902 P.2d 1326, 1327 n. 3 (Alaska 1995) (citing *Jackson v. Nangle*, 677 P.2d 242, 247 n. 3 (Alaska 1984)).